Patrick WALL, William McCallum d/b/a Green Acres Coin Laundries, Concerned Water Users of Clarke County, Plaintiffs,

v.

The CITY OF ATHENS, GEORGIA, known as The Mayor and Council of The City of Athens, Georgia, Defendant.

Civ. A. No. 84–68–ATH.

United States District Court,
M.D. Georgia,
Athens Division.

June 25, 1987.

James F. Ponsoldt, Joseph C. Nelson, Athens, Ga., for plaintiffs.

Dennis C. Galis, Athens, Ga., Robert B. Langstaff, Albany, Ga., for defendant.

FITZPATRICK, District Judge.

Pending before the court in this case are Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment. Named Plaintiffs Patrick Wall and William McCallum, and an unincorporated association in excess of 100 members known as "Concerned Water Users of Clarke County", filed suit in this court on June 29, 1984 against the City of Athens, alleging numerous violations of federal antitrust laws. Plaintiffs allege that Defendant City of Athens and several unnamed co-conspirators have, since approximately 1970, willfully conspired, contracted, and engaged in combinations:

(1) To divide markets and customers in the provision of water services in Clarke County, Georgia, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (Count One of Plaintiffs' complaint);

(2) To monopolize and attempt to monopolize, through conspiracies, the provision of water services in Clarke County, Georgia, in violation of Section 2 of the Sherman Antitrust Act; 15 U.S.C. § 2 (Counts Two and Four of Plaintiffs' Complaint); and

(3) To unjustly discriminate in price between in-city residents and out-of-city residents in the provision of water services, in violation of Sections 2(a) and 2(f) of the Clayton Antitrust Act, as amended, 15 U.S.C. § [ 13(a) and (f), (more commonly known as the Robinson-Patman Amendment) (Count Three of Plaintiffs' Complaint).

The complaint further alleges that Defendant City of Athens and the unnamed co-conspirators "engaged in [this] conduct for the purpose and with the effect of injuring the public interest in a competitive economy, damaging the plaintiffs and other commercial and residential purchasers of water, and eliminating, impeding, and excluding competition in the sale of water within Clarke County, Georgia and in northeast Georgia."

Defendant filed its response to the complaint along with a motion to dismiss the complaint on grounds that the City of Athens' activities are immune from attack under the antitrust laws under the "state action exemption" established by the Supreme Court decision in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Defendant also moved to dismiss the complaint on grounds that the court lacks subject matter jurisdiction over the Robinson-Patman claim and that Plaintiffs' complaint fails to state a claim against the Defendant based on the Supreme Court's decision in *Walla Walla City v. Walla Walla Water Co.*, 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898). Defendant also requested a dismissal of the prayer for damages in Plaintiffs' complaint on grounds that the Local Government Antitrust Act prohibits a damages award against a municipality even if federal antitrust violations have occurred.

The court notified the parties that it intended to consider limited evidentiary materials outside of the pleadings, and thus that the court would treat Defendant's motion to dismiss as a motion for summary judgment. However, because formal discovery was stayed in the case pending resolution of the legal questions presented by the motion, the court must consider all of Plaintiffs' allegations as true. Plaintiffs have submitted several affidavits and exhibits in support of their claims. To date, Defendant has not attempted by affidavits or exhibits to disprove any of Plaintiffs' allegations, choosing to rely on its argument that the questions of law presented by its motion mandate dismissal of the complaint. Thus, the court accepts as true the allegations of the complaint. Plaintiffs' motion for partial summary judgment, supported by numerous affidavits and exhibits, asks the court to hold that if immunity does not exist, Defendant's actions are *per se* illegal under the Sherman Act.

## I.

### FACTS ALLEGED IN PLAINTIFFS' COMPLAINT

The City of Athens is a municipality located in Clarke County, Georgia. As a profit-making venture, the city operates a water company that supplies water to city residents and to other Clarke County residents who do not live within the city limits. The City of Athens opened its water plant prior to the year 1916. In 1916, Defendant City of Athens enacted an ordinance establishing water rates for non-city residents at 1.25 times the rates for city residents due to the cost differential in providing services outside the city limits. From that time, and up until the year 1948, the out-of-city customers provided their own water lines. Beginning in 1948, Defendant began running its own lines outside the city limits pursuant to agreements and funding guarantees entered into at various times with Clarke County. To pay for the expansion, Defendant issued revenue certificates and increased the water rates for non-city residents to repay the certificates.

Defendant continued to expand its water business capacity throughout the following years, and in the early 1970's, raised the rates for out-of-city customers to 2.5 times that for city customers, without any cost justification for the differential. Since that time, Defendant has, in varying degrees, maintained this differential. The differential currently has the rates for non-city customers at 2.25 times that for city customers.

Defendant has allegedly maintained these artificially low rates for in-city customers in order to keep several large-volume in-city users such as Bishop's Hatchery, Inc., Central Soya Company, and Holiday Inn of Athens, from developing competitive, private water supplies. The complaint points out that at the time the cost differentials were established, an individual named Julius Bishop was Mayor of Athens, owner of Bishop's Hatchery, Inc. and a consultant and major supplier to Central Soya Company. Lewis Shropshire, the manager of the Holiday Inn of Athens, was a member of the Athens City Council and was Chairman of the finance committee, which was responsible for reviewing water rate decisions. Thus, the complaint alleges substantial self-dealing on the part of certain of Defendant's city officials. The extreme difference in rates for out-of-city as opposed to in-city customers is not cost-justified, and is greater than rate differentials charged by other similarly situated public and private water businesses.

The Defendant City of Athens entered into a territorial market division with the neighboring Oconee County Public Utility Authority whereby the City of Athens sells water at wholesale to the Oconee Authority contingent upon the refusal by the Authority to resell water to Defendant's existing non-city residential customers in Clarke County, or to a specific corporation, International Business Machines, should it locate a factory in Clarke or Oconee Counties in the future. Within four years prior to the filing of the complaint, the city entered into agreements with local planning and development commissions and their participants prohibiting these other political subdivisions in the Clarke County area from obtaining federal grants for the purpose of developing competing water businesses.

The City of Athens sells more than 90% of the water sold within the Clarke County, Georgia market. Further, the City of Athens has unilaterally applied successfully for the right to take, and now takes, "unnecessarily" large amounts of water from the Middle Oconee River and North Oconee River, and operates its water treatment plant in such a way as to prevent and exclude potentially competing water companies from obtaining the water necessary to compete. Further, Defendant has "refused to sell water at wholesale to major developers, subdivisions, apartment complexes, or political subdivisions" and has done so with the "specific purpose of gaining and retaining monopoly power in the sale of water in Clarke County".

Plaintiffs have asked for an order holding that Defendants have violated and are violating federal antitrust law. Further, Plaintiffs have requested a permanent injunction directing Defendant to cease and

desist from continuing these violations, as well as treble damages to named plaintiffs Patrick Wall and William McCallum, and an award for reasonable attorney's fees. McCallum's request for treble damages is based on a loss of profits from his operation of a laundry business, such loss being attributable to Defendant's monopolistic pricing of water.

## II.

### CONCLUSIONS OF LAW

#### A. State Action Immunity

The summary judgment motion in this case has been pending for approximately two years, and the law on state action immunity has developed extensively since the case was filed. The record is replete with arguments on the case law as it existed when the summary judgment motion was filed, and on the highly relevant recent developments since. Counsel for both parties are to be commended for their thorough research on the relevant authority, and for their periodic updates on the relevant recent developments in this area.

The issue squarely presented by this case is whether the State of Georgia, acting through its legislature, has given the City of Athens state action immunity from the reach of federal antitrust law in the city's provision of water services. A second related issue is whether, if such immunity has been granted by the State of Georgia, that immunity directly conflicts with federal antitrust law and thus is preempted by federal law. Because these two questions are so closely related, the court will address them jointly in this section.

In order to fairly analyze the immunity question presented by the facts *sub judice,* the court must briefly trace relevant portions of the historical background of the state action immunity defense. The Supreme Court in the case of *Parker v. Brown* held that the federal antitrust laws do not prohibit a state "as sovereign" from imposing certain anticompetitive restraints "as an act of government". 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The *Parker* court determined that the Sherman

Act was directed against "individual and not state action" and thus that the Act would not take on "an unexpressed purpose to nullify a state's control over its officers and agents." *Id.* 63 S.Ct. at 314. If a state "creates the machinery" for its officers or agents to engage in activities that violate the Sherman Act, and the state "adopts the program and enforces it", the Sherman Act does not apply, and the challenged activity is immune from antitrust attack under the state action exemption. *Id.*

Some forty years later, the Supreme Court considered the state action immunity defense as it applies to municipalities. *City of Lafayette, La. v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). The court in *City of Lafayette* was challenged with the question of whether a municipality, as a subdivision of the state, may engage in anticompetitive conduct with the protection of the state action exemption. The municipality in *City of Lafayette* was the owner and operator of an electric utility system, and was accused by a private electric utility system of violations of federal antitrust law. The State of Louisiana had enacted legislation that allowed municipalities the power to "own and operate electric utility systems both within and beyond their city limits." 98 S.Ct. at 1125.

In arguing that it was entitled to immunity under the state action exemption, the City of Lafayette urged that "since a city is merely a subdivision of a state and only exercises power delegated to it by the state, *Parker's* finding regarding the congressionally intended scope of the Sherman Act [applies] with equal force to such political subdivisions." *Id.* at 1127. The court analyzed the Sherman Act, which imposes liability on a "person" or "persons" for anticompetitive behavior, 15 U.S.C. §§ 1, 2, 3, 7, 8, and concluded that the term "person" or "persons" embraces both cities and states. *City of Lafayette* 98 S.Ct. at 1125. The court determined that where municipalities take anticompetitive action, such action is not automatically exempt from the

reach of the antitrust laws for several reasons:

Petitioners' contentions that their goal is not private profit but public service is only partly correct. Every business enterprise, public or private, operates its business in furtherance of its own goals. In the case of a municipally owned utility, that goal is likely to be, broadly speaking, the benefit of its citizens. But the economic choices made by public corporations in the conduct of their business affairs, designed as they are to assure maximum benefits for the community constituents, are not inherently more likely to comport with the broader interests of national economic well-being than are those of private corporations acting in furtherance of the interests of the organization and its shareholders....

*Id.* at 1131.

The *City of Lafayette* court rejected the city's argument that consumers dissatisfied with the service provided by municipal utilities may seek redress through the political process, thus making federal antitrust regulation unnecessary:

While petitioners recognize, as they must, that those consumers living outside the municipality who are forced to take municipal service have no political recourse at the municipal level, they argue nevertheless that the customers may take their complaints to the state legislature. It fairly may be questioned whether the consumers in question ... have a meaningful chance of influencing the state legislature to outlaw on an ad hoc basis whatever anticompetitive practices petitioners may direct against them from time to time. More fundamentally, however, that argument cuts far too broadly; the same argument may be made regarding anticompetitive activity in which any corporation engages. Mulcted consumers and unfairly displaced competitors may always seek redress through the political process. In enacting the Sherman Act, however, Congress mandated competition as the polestar by which all may be guided in ordering their business affairs. It did not leave this fundamental national policy to the vagaries of the

political process, but established a broad policy to be administered by neutral courts, which would guarantee every enterprise the right to exercise "whatever economic muscle it can muster" ... without regard to the amount of influence it might have with local or state legislatures.

*Id.* at 1133 (citations omitted).

If municipalities were free to make economic choices counseled solely by their own parochial interests and without regard to their anticompetitive effects, a serious chink in the armor of antitrust protection would be introduced at odds with the comprehensive national policy Congress established.

*Id.* at 1134.

■ Municipalities are not, simply by reason of their status as such, exempt from the antitrust laws. *Id.* at 1137. However, a municipality's anticompetitive activities are exempt from antitrust restraints when the actions of the municipality represent state policy. *Id.* The court concluded that the *Parker* doctrine exempts anticompetitive conduct engaged in by municipalities only when the municipality can show that it acted "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* If there is "an adequate state mandate for anticompetitive activities of cities", and the city can show that the state legislature contemplated the kind of anticompetitive action complained of, the city can claim state action immunity. *Id.* at 1138.

The *City of Lafayette* court remanded the case to the district court for further inquiry into whether the Louisiana statutes in question gave the city the right to engage in the anticompetitive conduct complained of. The court went on to note that "... even a lawful monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." *Id.* at 1139.

A subsequent relevant Supreme Court decision further developed the state action immunity exemption. *California Retail*

*Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). The *Midcal* court determined that, in addition to showing a clear and affirmative expression of a state policy to displace competition with regulation, the party claiming immunity from the antitrust laws must show that the state actively supervises the anticompetitive conduct. The *Midcal* case analyzed a state statute that authorized private parties, as opposed to municipalities, to engage in anticompetitive conduct.

The statute in question in *Midcal* required all wine producers and wholesalers to file fair trade contracts and price schedules with the state. Failure to comply with the rates set forth in the price schedules subjected a non-complying wholesaler to monetary fines, and potential license suspension or revocation. Thus, the statute authorized a resale price maintenance scheme by private parties, in violation of Section 1 of the Sherman Act.

Despite the fact that the challenged restraint on trade was clearly articulated and affirmatively expressed as a California state policy, the court found that the state of California did not "actively supervise" the anticompetitive conduct, and thus that the state action immunity defense would not apply. *Id.* 100 S.Ct. at 943:

> The state simply authorizes price setting and enforces the prices established by private parties. The state neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The state does not monitor market conditions or engage in any 'pointed reexamination' of the program. The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price fixing arrangement. As *Parker* teaches, 'A state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful ...'

*Id.* (citations omitted).

Returning to the state action exemption as it applies to municipalities, the Supreme Court placed a limit on the state action exemption in the case of *Community Commun. Co. v. City of Boulder, Colo.*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). The City of Boulder had granted an exclusive license to a cable television operator to provide cable television service within the Boulder city limits, and was challenged under the antitrust laws by a cable television operator who wished to complete with the exclusive franchisee. The City of Boulder pointed to its status as a "home rule" municipality under the Constitution of the State of Colorado, saying that legislation granting it "the full right of self-government in both local and municipal matters" was sufficient under *Lafayette* to provide the city with exemption from the antitrust laws. The Supreme Court disagreed, holding that the mere position of neutrality exhibited by the "home rule" legislation was not sufficient to evidence a "clearly articulated and affirmative expression" of the state policy to displace competition with regulation, as mandated by *Lafayette*. This legislation did not demonstrate that the legislature contemplated the kind of action complained of, and thus Boulder was not exempt from antitrust law in its activities in the area of cable television.

Numerous circuit courts both contemporaneous with and subsequent to the Supreme Court decisions in *Lafayette*, *Midcal*, and *Boulder*, have interpreted the state action immunity defense liberally. Using a two-pronged test, these courts have analyzed, first, whether the conduct is authorized under a clearly articulated state policy to displace competition with regulation, as opposed to a neutral grant of authority such as that in *Boulder*, and secondly, whether active state supervision, as required by *Midcal*, is present. The majority of these courts have upheld immunity for municipalities without distinguishing between the municipalities' "proprietary", as opposed to strictly governmental, activities.

For example, in *Community Builders, Inc. v. City of Phoenix*, 652 F.2d 823 (9th

Cir.1981), the court found a clear state policy to displace competition with regulation in a situation where two municipalities engaged in a horizontal division of markets, concerted refusal to deal, tying, and monopolization in the provision of water services, because the state had a law expressly forbidding competition between municipal utilities and other providers of public utility service, and a law assuring municipalities the right to acquire the facilities of any public service corporation by eminent domain. In *Central Iowa Refuse Sys., Inc. v. Des Moines Metro. Solid Waste Agency*, 715 F.2d 419 (8th Cir.1983), the court upheld immunity after determining that the state legislature contemplated the imposition of restrictions on competition in the disposal of solid waste under statutes allowing cities and counties of the state to provide for environmentally safe and sanitary disposal of solid waste. The legislation also allowed cities and counties to contract jointly, pursuant to certain provisions, to provide for environmentally safe and sanitary disposal of solid waste, and to contract to provide common disposal facilities.

The court in *Springs Ambulance Serv., Inc. v. City of Rancho Mirage, Calif.*, 745 F.2d 1270 (9th Cir.1984) upheld immunity for anticompetitive conduct in a municipality's provision of ambulance services because a state statute provided that "A legislative body of the city may contract for ambulance service to serve the residents of the city as convenience requires." In *Catalina Cablevision Assoc. v. City of Tuscon*, 745 F.2d 1266 (9th Cir.1984) the court upheld immunity in the area of cable television service provision because a state statute provided, notably much more specifically than in *Boulder*, that "for the purpose of authorizing and regulating construction, operation and maintenance of cable television systems, the licensing authority of a city or town for an incorporated area ... either individually or jointly by intergovernmental contract, may issue a license to any person to use public streets, roads and alleys, and shall impose conditions, restrictions and limitations upon the use of such public street, roads, and alleys

and upon the construction, operation and maintenance of cable television systems." *Id.* at 1268–69.

The Supreme Court's last word on the issue of state action immunity as applied to municipalities broadened the already relatively lenient scope of the immunity defense. The court directly addressed a question it had expressly left open in *Boulder*, and a question that had given lower courts some confusion: namely, whether the *Midcal* requirement of active state supervision applies when the state statute provides for anticompetitive conduct by municipalities as opposed to private actors. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). The court decided that the *Midcal* requirement does not apply to municipalities, and thus that when the actor is a municipality, all that must be shown is a clear and affirmative expression of state policy to displace competition with regulation. The *Town of Hallie* case is also a landmark decision in this area because it was the first time that the Supreme Court defined how "clearly articulated" the state policy in question must be.

*Town of Hallie* was brought by a group of unincorporated Wisconsin townships against an adjacent city, alleging that the city had violated the Sherman Act by acquiring a monopoly over sewage treatment in the area and by providing that service only to areas willing to be annexed by the city and to use the city's sewage collection services rather than those of the town. The relevant statute granted authority to cities to construct, add to, alter and repair sewage systems.

The authority includes the power to 'describe

> with reasonable particularity the district to be [served]'.... This grant of authority [is] supplemented by [a statute] providing that a city operating a public utility 'may by ordinance fix the limits of such service in unincorporated areas. Such ordinance shall delineate the area within which service will be provided and the municipal utility shall have no obli-

gation to serve beyond the area so delineated.'

*Id.* 105 S.Ct. at 1718.

The Wisconsin statute further provided that a city's sewage system could be constructed so that other cities, towns, and areas could connect to the system, and that the State Department of Natural Resources could order such connection to be made. However, an order by the Department of Natural Resources for the connection of unincorporated territory to a city system could be refused by the city if the unincorporated territory refused to become annexed to the city. *Id.*

The Supreme Court concluded that these statutes clearly contemplated that the city might engage in anticompetitive conduct in the provision of sewage services. The court further held that such conduct was a foreseeable result of empowering the city to refuse to serve unannexed areas. "It is not necessary, as the Towns contend, for the state legislature to have stated explicitly that it expected the city to engage in conduct that would have anticompetitive effect." *Id.* at 1720. The court did not require a high degree of specificity in accordance with that insisted on by the unincorporated towns, and held that, in order to pass the "clear articulation" test, the legislation in question need not specifically state that it is intended to create a public monopoly, or to condone anticompetitive practices. "No legislature can be expected to catalog all of the anticipated effects of a statute of this kind". *Id.* at 1719. Further, the court rejected the Towns' argument that the state action test requires at least that the city show that the state "compelled it to act" in an anticompetitive manner. *Id.* at 1720.

*Town of Hallie* is admittedly an important case in the area of state action immunity as applied to municipalities, and has been held by subsequent district and circuit courts to have broadened the state action defense. However, it is relevant that *Hallie*, rather than overruling *Lafayette* or *Boulder*, relied specifically on those two cases. The *Hallie* case supplements *Lafayette* and *Boulder* rather than replacing them. *Lafayette* and *Boulder* are still precedent in this court's opinion, and are relevant to the facts *sub judice*.

The parties' positions in the case, in light of the relevant Supreme Court decisions, are clear. First, Plaintiffs analogize the relevant Georgia legislation on the provision of water services as akin to the position of neutrality present in *City of Boulder*. Defendant, on the other hand, argues that the legislation evidences a clear affirmative expression of a policy to displace competition with regulation, similar to that in *Town of Hallie* and numerous circuit decisions. Secondly, and presenting a perhaps more difficult question, Plaintiffs argue that the City of Athens' water department is purely a proprietary, profit-making venture, similar to a private operation, thus subject to the *Midcal* requirement of active state supervision. Defendant responds to this argument by pointing out the lack of any distinction in any of the above-cited cases between a municipality's profit-making activities as opposed to strictly governmental activities for purposes of antitrust immunity. Defendant argues that the fact that the City of Athens engages in the provision of water for profit is meaningless under *Town of Hallie* because any municipal activity, if taken pursuant to a clearly articulated policy to displace competition with regulation, is excused from the *Midcal* requirement of active state supervision, even if the activity furthers profit-making interests.[1]

---

1. The *Midcal* requirement was recently reaffirmed by the Supreme Court in the case of *324 Liquor Corp. v. Duffy*, —— U.S. ——, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987). The *Duffy* court held that a New York statute purporting to authorize *per se* illegal combinations by private actors, in violation of the Sherman Act, was void, and was preempted by the Sherman Act. *Id.* See also *Fisher v. City of Berkeley*, holding that a state statute allowing a municipality, as opposed to a private party, the right to impose rent ceilings on residential real property was not preempted because it was not facially inconsistent with the Sherman Act. 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). But the court also held that:

> There may be cases in which what appears to be a state—or municipality—administered price stabilization scheme is really a private

**1. Relevant Georgia legislation: Does it clearly articulate a state policy to displace competition with regulation?**

The relevant Georgia legislation dealing with municipalities' authority to regulate the provision of water services is as follows:

In addition to the other powers which it may have, any municipal corporation shall have the power under this chapter:

(1) To acquire by gift, by purchase, or by the exercise of the right of eminent domain, to construct, to reconstruct, to improve, to better, and to extend any water system or sewage system, or both, within the municipal corporation;

(2) To acquire by gift, by purchase, or by the exercise of the right of eminent domain any lands, easements, rights in lands and water rights in connection therewith;

(3) To operate and maintain any such systems for its own use and for the use of public and private persons within the territorial boundaries of the municipal corporation who use the system or to whom the system is made available at the property owned by such persons; and

(4) To prescribe, revise, and collect rates, fees, tolls or charges for the services, facilities, or commodities furnished by such systems ...

O.C.G.A. § 36–34–5 (Supp.1986).

Georgia case law indicates that nothing in the general authority conferred under this section in respect to the acquisition or construction of a water system, in addition to any powers a municipality may already have, empowers a city to compel the use of city water or connection to a city water system. *City of Midway v. Midway Nursing & Convalescent Center, Inc.*, 230 Ga. 77, 195 S.E.2d 452 (1973). Further, a municipal corporation may not compel any per-

son outside its territorial limits to accept water service which it undertakes to furnish, nor may municipal authorities be compelled to render such service to out-of-city residents. *City of Moultrie v. Burgess*, 212 Ga. 22, 90 S.E.2d 1 (1955).

The Georgia Constitution, in relevant part, provides as follows:

(a) In addition to and supplementary of all powers possessed by or conferred upon any county, municipality, or any combination thereof, any county may exercise the following powers and provide the following services:

. . . . .

(6) Storm water and sewage collection and disposal systems;

(7) Development, storage, treatment, purification and distribution of water.

Ga. Const. art. IX, § 2, ¶ 3(a)(6) and (7). The Georgia Constitution also requires a municipality, if providing the above services outside its own boundaries, to contract with the county or municipality affected. Ga. Const. art. IX, § 2, ¶ 3(b)(2).

The City of Athens brought to the court's attention portions of the Athens City Charter, adopted by the Georgia legislature in Georgia Laws, 1979, p. 3770, *et seq.* Defendant argues that the City Charter represents state policy and provides the most detailed Georgia statutory scheme relating to the present case. The relevant provisions are as follows:

Specific powers; certain powers enumerated.

(a) The city may acquire, construct, and maintain, by condemnation or otherwise, inside or outside the city limits, ... waterworks systems ...

(b) In addition to the powers now or hereafter granted to municipalities by

price-fixing conspiracy, concealed under a 'gauzy cloak of state involvement,' ... *This might occur even where prices are ostensibly under the absolute control of government officials* ... we have been given no indication that such corruption has tainted the rent controls imposed by Berkeley's Ordinance ... the Ordinance can hardly be viewed as a cloak for

any conspiracy among landlords or between the landlords and the municipality ...
*Id.* 106 S.Ct. at 1051 (citations omitted) (emphasis added). Plaintiffs' complaint in this case alleges exactly the type of price-fixing recognized by the *Fisher* court as being distinguishable and outside of the protection afforded by *Fisher*.

law, the city shall have the following powers:

. . . . .

(2) Assessing for cost of improvements.

a. The city shall be authorized to make special assessments with or without petition against benefited property within its corporate limits for:

. . . . .

3. Constructing, reconstructing, extending, and otherwise building or improving water systems;

. . . . .

(6) Eminent domain; water and sewer systems.

As further cumulative and supplemental of its powers, the Mayor and Council of the City of Athens is authorized and empowered under any available procedures provided by Georgia law, including but not limited to condemnation before a special master (Ga. Laws 1957, pp. 387, 388, 389, *et seq.*, as amended), to exercise the right of eminent domain, to construct, to reconstruct, to improve, to better, and to extend any water system, sanitary sewage system or solid waste disposal facility or area, both within and without the corporate limits of said municipality, and to acquire by gift, purchase, or the exercise of the power of eminent domain under any available procedure now or hereafter provided by Georgia law, including but not limited to condemnation before a special master (Ga. Laws, 1957, pp. 387, 388, 389, et seq., as amended), any lands in fee simple, easements, rights in lands, or water rights in connection therewith or as may be necessary therefore, located either within or without the corporate limits of the Mayor and Council of the City of Athens.

(7) Water system.

a. The Mayor and Council of the City of Athens is hereby authorized and empowered to extend, enlarge, or otherwise improve the existing water supply and waterworks system of the City of Athens as the occasion arises in any manner or to any extent that is or may be needful either by a development of the present system or the creation of a new system, and to that end the said Mayor and Council of the City of Athens shall have the power and authority to purchase, hold, receive, enjoy, acquire, and possess any estate or estates, real or personal, lands, tenements, or hereditaments of whatever kind or nature whatsoever, and also all rights, privileges, easements, and profits necessary or appropriate or useful for the purposes of obtaining a sufficient and complete water supply for the City of Athens and shall have the power to hold and acquire and use all such rights and property an estates, either within or without the limits of the City of Athens, including ownership and dominion in whole or in part over the watershed from which the supply comes, so as to prevent any hurtful use of said watershed and to preserve and protect the purity of its waters.

b. The Mayor and Council of the City of Athens is further empowered and authorized to cause such suitable examinations and surveys to be made for any purposed extension of its waterworks system as shall be necessary or proper for the selection of the most advantageous location or locations, site or sites, watershed or watersheds, right or rights, and way or ways, for locating all their works and appliances for bringing the water and distributing it throughout the City of Athens, and for such purpose the said Mayor and Council of the City of Athens by its officers, agents, servants or employees shall have the right to enter upon the lands or ways of any person, and the said Mayor and Council of the City of Athens, by its agents aforesaid, may construct its works or lay its pipes, upon acquiring the property or right so to do, as the case may be, with the necessary way or ways, dams, canals, raceways, reservoirs, excavations or embankments, and maintain the same, and do any other acts and things necessary or appropriate for the construction and maintenance of said works, either within

or without the corporate limits of said City of Athens.

. . . . .

1979 Ga. Laws § 1–103.

Plaintiffs argue that the following provision is relevant:

(c) The General Assembly shall not have the power to authorize any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition, or encouraging a monopoly, which are hereby declared to be unlawful and void.

(d) The General Assembly shall not have the power to regulate or fix charges of public utilities owned or operated by any county or municipality of this state, except as authorized by this Constitution.

Ga. Const. art. III, § 6, ¶ 5(c) and (d).

The following legislation was enacted by the legislature after the decision of the Supreme Court in *Boulder:*

Chapter 19—Immunity from Antitrust Liability. Statement of Policy.

It is declared by the General Assembly of Georgia that in the exercise of powers specifically granted to them by law, local governing authorities of cities and counties are acting pursuant to state policy.

O.C.G.A. § 36–19–1 (effective April 4, 1984).

Immunity of local governments from antitrust liability.

This chapter is intended to articulate clearly and express affirmatively the policy of the State of Georgia that in the exercise of such powers, such local governing authorities shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia.

O.C.G.A. § 36–19–2 (effective April 4, 1984).

■ Defendant relies on this last piece of legislation, stating that it shows the intent of the Georgia legislature to protect municipalities from antitrust attack and to return to a *"pre-Boulder"* immunity. The court does not agree, as "the state may not validate a municipality's anticompetitive conduct simply by declaring it to be lawful." *Hallie,* 105 S.Ct. at 1716, *citing Parker,* 63 S.Ct. at 307. To the degree that this state legislation attempts to displace Supreme Court authority, it is preempted by federal antitrust law. *See generally 324 Liquor Corp. v. Duffy,* —— U.S. ——, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987). The court is left with the City of Athens Charter, and provisions of the Official Code of Georgia and the Georgia Constitution, to determine whether Georgia has clearly and affirmatively expressed a policy to displace competition with regulation in the provision of water services.

■ The court does not accept the Athens City Charter, although adopted in Georgia Laws, as clear and affirmative evidence of state policy. The "clearly articulated policy to displace competition with regulation" must come directly from the state, and local legislation is not sufficient to evidence state policy. *City of Lafayette,* 98 S.Ct. at 1137, fn. 43. The mere fact that the charter has been adopted into Georgia Laws does not mean that the state has considered every provision therein, and considers it to express state policy. In fact, Plaintiffs have produced affidavits of state legislators on the legislative procedure of the State of Georgia, which proves that local legislation is generally adopted without change, and without the extensive debates and revisions that go into the actual law of the state.

Thus, the court must look to the provisions in the Georgia Constitution and O.C.G.A. § 36–34–5. After careful analysis, the court has concluded that while this legislation does establish a policy to displace competition with regulation to some degree, and that the legislation immunizes some of the anticompetitive activities engaged in by Defendant from antitrust attack under the state action exemption, the legislation does not provide the state action exemption for *all* of Defendant's anticompetitive activities. The conduct alleged by Plaintiffs as being anticompetitive can be divided into several categories:

(1) Horizontal divisions of markets between the City of Athens and other political subdivisions such as Oconee County;

(2) Willful maintenance of a monopoly and anticompetitive conduct to maintain that monopoly, such as increasing capacity beyond the needs of the current market (thus preempting supplies of water from potential competitors, both public and private);

(3) Contracting and conspiring with private parties as opposed to political subdivisions to maintain artificially low rates for these private parties in exchange for the private parties' agreements not to engage in direct competition; and

(4) Maintenance of a discriminatory rate schedule, without cost justification, in order to make up for the losses incurred by its conduct in Number Three, above.

■ The Georgia legislation contemplates and clearly articulates a policy allowing the conduct described in Numbers 1 and 2 above. However, this court does not believe that the Georgia legislation empowers Defendant to claim immunity under the state action exemption for the conduct described in Numbers 3 and 4.

The statutes in question do not, as Plaintiffs argue, express a position of neutrality such as that found in *Boulder*. While the court does not necessarily agree with the equity of allowing Defendant to contract with other political subdivisions to divide markets, the Georgia statutes and constitutional provisions, and the overwhelming precedent decided subsequent to *Town of Hallie*, necessitate that this court find immunity with regard to the market division and monopolization counts.

For example, in *Hallie* itself, the statutes were no more explicit than the statutes in this case. Still, the court thought them sufficient to satisfy the requisite standards, holding that the state law contemplated some restriction of competition, and that the conduct arising thereunder need not be specifically or expressly authorized, or mandated and supervised by the state. *Hallie*, 105 S.Ct. at 1719. This was true even though the municipality in *Hallie* operated its sewage collection and treatment system as a profit-making venture.

To compare the two statutory schemes specifically, the municipalities in both cases

were empowered by the state to operate the utility systems in question inside their territories. *Hallie*, 105 S.Ct. at 1715; Ga. Const. art. IX, § 2, ¶ 3(a)(7). As in *Hallie*, the City of Athens has no obligation to serve areas outside its jurisdiction. *Hallie*, 105 S.Ct. at 1715; *City of Moultrie*, 212 Ga. at 24, 90 S.E.2d at 3. The municipality in *Hallie* was given the right to provide landowners in neighboring territories with sewage treatment and collection services if the landowners become annexed to the city, effecting a tying of services. *Hallie*, 105 S.Ct. at 1718. Similarly, the Georgia Constitution allows local governments to provide services outside their territories *if* they contract with the county or municipality affected. Ga. Const. art. IX, § 2, ¶ 3(b)(2). This legislation contemplated that political subdivisions could divide markets by contract.

The case of *LaSalle Nat'l Bank of Chicago v. County of DuPage*, 777 F.2d 377 (7th Cir.1985) upheld immunity under the state action exemption for conduct virtually identical to the conduct undertaken by the City of Athens. The Seventh Circuit held that an agreement between two villages to divide, between themselves, territories outside their boundaries for the purpose of providing water services was immune from antitrust attack where the villages were authorized by state law to "associate among themselves" and "to provide water services to residences outside their boundaries." *Id.* at 384. The fact that state case law had authorized the villages to refuse to provide water services outside their boundaries also showed that anticompetitive effects were foreseen. *See also City of Phoenix*, 652 F.2d at 823.

Similar cases decided subsequent to *Hallie* are virtually unanimous in upholding the state action immunity defense. In *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 522 (8th Cir.1985), the court held that where a city engages in anticompetitive conduct in the nature of granting an exclusive franchise in the area of waste disposal, and the city has been given authority by the state generally to regulate waste disposal, anticompetitive

conduct by the city in the area of waste disposal is immune to antitrust attack even though state law is silent on whether or not a monopoly is authorized. In *Grason Elec. v. Sacramento Mun. Util. Dist.*, 770 F.2d 833 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986), the court held that a state policy to displace competition could be inferred from the "broad authority to regulate" electrical distribution, and that this legislation contemplated that the municipality would maintain a monopoly in electrical distribution. *Id.* at 836.

The court in *Carlson T.V. v. Marble City*, 612 F.Supp. 669 (D.Minn.1985), held that where a state statute authorizes a city to own and operate a cable television system, the state contemplated that the city would operate its own system to the exclusion of a private system. *See also Patrick v. Burget*, 800 F.2d 1498 (9th Cir.1986); *Rural Elec. Co. v. Cheyenne Light, Fuel and Power Co.*, 762 F.2d 847 (10th Cir. 1985); *Cine 42nd St. Theatre Corp. v. Nederlander Org., Inc.*, 609 F.Supp. 113 (S.D.N.Y.1985) *aff'd.* 790 F.2d 1032 (2d Cir. 1986); *Unity Ventures v. County of Lake*, 631 F.Supp. 181 (N.D.Ill.1986) (dismissing by J.N.O.V., on state action exemption grounds, a $28.5 million jury verdict awarded prior to *Hallie*) *Wellwoods Dev. Co. v. City of Aurora*, 631 F.Supp. 221, 223 (N.D. Ill.1986).

This precedent in this area convinces the court that the Georgia legislation contemplates that political subdivisions, in their provision of water services, will contract amongst themselves to divide markets in the provision of water services, and that such political subdivisions may establish and maintain monopolies in this area. However, the court feels that dicta in the *City of Lafayette* case is relevant as to the rest of the allegations in Plaintiffs' complaint: "... even a lawful monopolist may be subject to antitrust restraint when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization." 98 S.Ct. at 1123.

■ The City of Athens has exploited its natural monopoly power by some of its conduct, far overstepping the authority for which it can claim a state action exemption. By furthering purely parochial interests through contracts in restraint of trade between city officials and private corporations, and by discriminating economically and commercially between residents of the city and residents outside of the city, the city has engaged in conduct outside of the protection of "sovereign state policy". Nothing in the Georgia legislation indicates that the legislature contemplated such anticompetitive conduct. The court in *Town of Hallie* cautioned against examining legislative intent too closely, recognizing that a legislature cannot contemplate *all* potential anticompetitive effects of a statute. However, at some point, careful scrutiny of legislative intent becomes a necessity.

■ Even the *Hallie* court stated that the anticompetitive conduct *"must be a foreseeable result"* of the enabling statute. 105 S.Ct. at 1719. The City of Athens' arbitrary discrimination, and self-dealing between private parties and city officials, is not a foreseeable result of allowing it, presumably in the public interest, to maintain a monopoly in the provision of water services. To hold otherwise would be, to coin a phrase by Plaintiffs' attorney, to allow municipalities the unfettered freedom to establish "crown monopolies" of the precise type that the antitrust laws were promulgated to defeat.

While the court's ruling in this regard is perhaps more complicated than ruling that either all of the city's activities are exempt, or that none of them are exempt, the court feels that there are important distinctions in the foreseeability of the different types of conduct alleged. In summary, the holding of the court is that while the legislature contemplated that the City of Athens would gain and maintain monopoly power in the provision of water services, and while the legislature contemplated that Athens might maintain this monopoly by contracting with other political subdivisions to divide markets and territories, the legislation does not show that the legislature contemplated that the City of Athens would exert its monopoly power by unjust-

ly discriminating against out-of-city residents, and by contracting with large, private in-city corporations to further purely proprietary interests to the detriment of many customers.

The court is aware that it is in the minority, after *Hallie*, by refusing to allow the City of Athens to claim state action immunity for all of its anticompetitive conduct. In addition to the voluminous case law upholding immunity, Defendant has cited numerous scholarly articles by experts in the antitrust field, most of which embrace the theory that, subsequent to the *Hallie* decision, virtually all municipal activities are immune from antitrust attack. *See, i.e.* Freidman, *Antitrust III: The State Action Doctrine*, 1985 Annual Surv. of Am. Law 491 ("In *Town of Hallie* ... the Court returned to a less demanding standard for immunity." *Id.* at 510); Steuer, *Coming Full Circle on State Action*, 7 Cardoza L.Rev. 439 (1985); Note, *Antitrust Immunity: The State of State Action*, 88 West Va.L.Rev. 783 (1986). In the latter article, the author concluded that *Town of Hallie* "reduced all previous documentations of municipal antitrust immunity to a state of obsolescence, save for their historical significance" *Id.* at 809. The author reported that the post-*Hallie* cases have consistently awarded antitrust immunity in actions against municipalities and concluded that such post-*Hallie* cases:

> ... gave liberal interpretation to the clear articulation requirements in injunctive suits, deeming that requirement to be satisfied on the basis of a mere indication or a logical, reasonable, or necessary inference of state legislative intent to displace competition.

*Id.* at 821.

Even under such "liberal interpretation," the court feels that certain of the City of Athens' actions do not comport with the "logical and reasonable" expression of the state's intent to displace competition with regulation.[2] The author of the article in the Cardoza Law Review recognized that, with regard to municipalities' regulation of public utilities, "rarely is there no state statute that applies at all". 7 Cardoza L.Rev. at 448. The author acknowledged the wide reach of immunity, and expressed his opinion that the only time immunity is unavailable to a city is when the city's political process is "corrupted by such evils as self-dealing or bribery". *Id.* at 450. Taking the plaintiff's allegations in the complaint as true, which the court must do at this point in the proceedings, the plaintiffs have alleged just this sort of conflict in the City of Athens' political process and its dealings with private corporations.

**2. Are the City of Athens' profit-making activities subject to the *Midcal* requirement of active state supervision?**

 Plaintiffs argue that even the City of Athens' contracts with other political subdivisions are subject to antitrust attack because the city is not actively supervised by the state as required by *Midcal*. Plaintiffs argue that the City of Athens functions in a private, profit-making, parochial manner in its provision of water services, thus falling outside of *Hallie's* holding that municipalities, as opposed to private parties, are not subject to the "active state supervision" requirement. The court is unable to accept this argument because the court must rule in accordance with the Supreme Court's decision in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), which abolished the distinctions between a municipality's "private" as opposed to "public" activities. However, the court would like to address, in the course of this opinion, the inherent unfairness of the double position taken by the City of Athens. For purposes of antitrust immunity, the city stresses its status as a municipality. But in a similar suit alleging constitutional violations, it argued as a defense the lack of state involvement in its provision of wa-

---

**2.** For further analysis of the impact of *Hallie*, see Quinlan, *Do Local Government Lawyers Really Have to Worry About Antitrust Laws?* I N.Y.S. Bar J. (Nov. 1985) II N.Y.S. Bar J. (Dec. 1985); Stewart, *Supreme Court Report: Suing Local Governments*, 71 ABA J. 115 (June 1985); Comment, *Antitrust: Sherman's March Through Municipalities is Halted at Eau Claire, Wisconsin [Town of Hallie v. City of Eau Claire ...]*, 25 Washburn L.J. 358 (1986).

ter services due to the nature of such services as a purely profit-making venture, akin to that of a private corporation.

In a separate, related case that took place in the state courts of Georgia, Plaintiffs sought a declaratory judgment in Clarke County Superior Court. Plaintiffs alleged that the city's water ordinance was unconstitutional and that it deprived Plaintiffs of property without due process of law, because they had no meaningful opportunity to be heard on the discriminatory rate schedule. Plaintiffs also alleged, in that suit, that the water service agreement between the plaintiffs and the city was an "open-price-term" contract which could be set aside under the U.C.C., O.C.G.A. § 11-2-305 (1982), because the city had not fixed the price in good faith. In addition, Plaintiffs alleged that their agreement with the city violated the unconscionability provisions of the U.C.C. O.C.G.A. § 11-2-302 (1982). The Superior Court granted summary judgment in favor of the City of Athens, and the decision of the superior court was ultimately affirmed by the appeals court.

The Clarke County Superior Court held, in accordance with the city's argument, that the plaintiffs were not entitled to constitutional protection from the City of Athens' conduct because the City of Athens ran its water business as a "private, non-governmental business". Further, the court held that the U.C.C. did not bar the City of Athens from engaging in such conduct, as Plaintiffs were not forced to purchase water from Defendant, nor did Defendant have any power to compel Plaintiffs to take advantage of the contract.

After the city argued throughout the litigation in the state courts that it did not violate Plaintiffs' constitutional rights because it operated its waterworks as a private business as opposed to a public business, the defendant came to this court and argued that it is entitled to a state action immunity exemption from the antitrust laws because it is acting pursuant to and in accordance with a state grant of authority. While these conflicting positions are inherently unfair, the court reluctantly agrees

with Defendant that under the *Hallie* case and, more importantly in this regard, the *Garcia* case, the court cannot distinguish between a municipality's "proprietary" conduct as opposed to its "traditional, governmental" conduct.

The Supreme Court in *Hallie* did not in any way suggest that there should be a distinction between a municipality's profit-making and nonprofit-making functions for purposes of antitrust immunity. Some two months prior to *Hallie*, the Supreme Court's decision in *Garcia* expressly held that such a distinction was irrelevant for purposes of determining the immunity of municipal activities from federal regulation under the Commerce Clause. Thus, the *Garcia* court effectively did away with the distinctions between "governmental" and "traditional" functions of a municipality as opposed to "proprietary" or "non-governmental" functions. 105 S.Ct. at 1720–21. In doing away with this distinction, *Garcia* discussed several circuit decisions that had struggled with the difficult question of categorizing a municipality's activities in this manner. At least one of these circuit decisions dealt with antitrust immunity, causing this court to believe that the *Garcia* reasoning applies to the facts *sub judice*. Therefore, it is this court's conclusion that, under *Garcia*, the court cannot engage in a distinction which would hold the City of Athens to a different standard merely because its provision of water services is a profit-making interest as opposed to a traditional function.

### 3. *Auton* and *Falls Chase:* Do they mandate state action immunity for the City of Athens?

In reaching this decision, the court has had to closely analyze two recent Eleventh Circuit decisions which upheld municipal immunity under the state action exemption for anticompetitive conduct in the provision of water services by two Florida cities. *See Auton v. Dade City, Fla.,* 783 F.2d 1009 (11th Cir.1986); *Falls Chase Special Taxing Dist. v. City of Tallahassee,* 788 F.2d 711 (11th Cir.1986). Although these cases appear to sanction the type of conduct undertaken by the City of Athens in

this case, the court feels the statutory schemes of Florida and Georgia are significantly different as to exactly what sort of anticompetitive conduct each state contemplated in the water service area. Additionally, the conduct undertaken by the City of Athens is significantly different from the conduct engaged in by the municipalities in these cases.

Both *Auton* and *Falls Chase* were antitrust actions brought against municipalities, and both cited *Hallie* as governing the standard for antitrust immunity. In *Auton*, Defendant Dade City was accused of monopolizing the water market by enacting a city ordinance prohibiting construction of private water wells. In *Falls Chase,* the defendant city was accused of attempting to monopolize water and sewage services in areas outside the city. Under *Lafayette* and *Hallie,* the Eleventh Circuit found state action immunity in both cases even though the state law had not directly authorized the specific activity complained of. The Florida law, cited by the Eleventh Circuit as proof of a clear articulation of the state policy to displace competition with regulation, included:

(1) Florida Statute § 180.06(3), (6), authorizing local governments to treat and distribute water;

(2) Florida Statutes § 180.22 and § 66.-411, giving local governments the power of eminent domain for laying water pipe;

(3) Florida Statute § 180.13, giving local governments the power to fix water rates;

(4) Florida Statute § 180.02(1), (2) authorizing cities to extend waterworks systems up to another city's boundaries; and

(5) Florida Statute § 180.06, requiring that permission be obtained from a city or company with a waterworks system before such system can be built in territory adjacent to the pre-existing system.

Several of these Florida statutes have counterparts in Georgia law, such as the Georgia statute giving local governments the power to fix water rates. O.C.G.A. 34–36–5(d) (Supp.1986). Neither the Florida or the Georgia statute expressly authorizes rate-fixing for out-of-city customers, however. Georgia law contains no statute equivalent to Florida Statute § 180.06. Most importantly, although this fact was not discussed by the *Falls Chase* and *Auton* courts, Florida Statute § 180.191 limits the differential that a city can charge to out-of-city users.. Georgia, by contrast, does not limit the city's delegated authority in this manner.

Defendant argues that this distinction has no relevance to the question of state action immunity; however, the court feels that it is important that the Florida provision of water services is closely regulated as a public monopoly. Thus, Florida has a check on a municipality's ability to engage in the type of anticompetitive conduct engaged in by the City of Athens in this case. Defendant also argues that Georgia has simply delegated more authority to its cities than Florida has in this area, due to the absence of a statute limiting rate differentials. The court feels, on the contrary, that Georgia's silence on this issue evidences that such anticompetitive action was not contemplated by the legislature.

The City of Athens, like the municipalities in *Auton* and *Falls Chase,* can refuse to serve unannexed areas. However, if the City of Athens chooses to profit by serving out-of-city residents, and willfully maintains a monopoly by foreclosing the opportunities the out-of-city residents have to develop competing water systems, the city cannot further benefit by state action immunity for its discriminatory rate schedules and contracts with private parties. Plaintiffs have exhausted every option available to them to attempt to maintain some check on the City of Athens' restraints on trade. The court will not grant immunity for the City of Athens' activities that go beyond the anticompetitive action contemplated by the Georgia legislature.

**B. Robinson-Patman Act Jurisdiction**

Count 3 of Plaintiff's complaint alleges unjust price discrimination in violation of the Robinson-Patman Amendment to the Clayton Act:

50. Defendant currently sells water in commerce to the plaintiffs and other

commercial water customers who are located outside of the City of Athens at 2.25 times the rate being charged to the plaintiffs' competitors within the City of Athens. This water is then effectively resold by plaintiffs in commerce at a competitive disadvantage vis-a-vis in city competition.

. . . . .

53. The effect of Defendant's discriminatory rate structure is to substantially lessen competition in the resale of water in commerce within the apartment, motel, laundry, car wash, beverage, ice, food and industrial processing market and other markets for which the cost of water is a substantial component of overall price....

Plaintiff's complaint also alleges in earlier paragraphs, that, in addition to having a substantial effect on interstate commerce, the City of Athens' conduct "substantially prejudices and impedes the competitive development of commercial water users *who resell water in interstate commerce outside the City of Athens.* This discriminatory rate schedule has substantially affected the flow of water and other commodities, and services in interstate commerce." (emphasis added).

■ Under the Robinson-Patman amendment, the allegedly discriminatory sales must have been actually sold *in* interstate commerce, rather than merely having affected interstate commerce. *Hiram Walker, Inc. v. A & S Tropical*, 407 F.2d 4 (5th Cir.1969). The court in *Hiram Walker* held that under the Robinson-Patman amendment, at least one of the sales alleged to have been discriminatory must have been in interstate commerce, and when all sales were made within the State of Florida, there was no merit to the contention that such sales were made in interstate commerce. *See also Gulf Oil Co. v. Copp Paving Co.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), holding that "At least one of the two transactions which, when compared, generate a discrimination ... [must] cross a state line". *Id.*

■ Defendant has moved to dismiss Plaintiffs' Robinson-Patman claim, arguing that Plaintiffs have not alleged sufficient interstate transactions, and that it is undisputed that there are no sales of water involved in this action that crossed state lines. The contention is, at best, premature, because the complaint adequately does allege "in commerce" jurisdiction. *See* Plaintiffs' Complaint, ¶ 3, 13, 19, 50 and 51. At this stage of the litigation, before any discovery has taken place, the court cannot say without dispute that Plaintiffs will be unable to prove these allegations. The fact that Defendant's water customers are physically located in northeast Georgia does not automatically prove that no sales of water effectively crossed state lines.

The court is aware that Plaintiffs may have difficulty proving these allegations, but when a complaint adequately pleads "in commerce" jurisdiction, the facts regarding the assertion of such jurisdiction are necessarily placed in dispute, and it is improper to dismiss a Robinson-Patman claim. The jurisdictional argument raised by Defendant cannot be resolved against Plaintiff until Plaintiff has completed discovery. *See, i.e., Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740, 96 S.Ct. 1848, 1850, 48 L.Ed.2d 338 (1976); *McBeath v. Inter-American Citizens for Decency Comm.*, 374 F.2d 359 (5th Cir.), *cert. denied*, 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967). Thus, Defendant's motion is denied as to this count.

**C. Defendant's motion for failure to state a claim under *Walla Walla City v. Walla Walla Water Co.***

Defendant argues that the case of *Walla Walla City v. Walla Walla Water Co.*, 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898) expressly condones Defendant's conduct. The City of Walla Walla, Washington, entered into an agreement with the Walla Walla Water Company under which the water company was granted the right to lay and maintain water mains within the city for 25 years. During the life of that contract the city agreed not to erect its own water works in competition with the water company. The Supreme Court ap-

proved the enforceability of this contract, and summarized its approval as follows:

In establishing a system of water works a company would necessarily incur a large expense, in the construction of the power house and the laying of its pipes through the streets, and, as the life of the contract was limited to 25 years, it would naturally desire to protect itself from competition as far as possible, and would have a right to expect that at least the city would not itself enter into such competition. It is not to be supposed that the company would have entered upon this large undertaking in view of the possibility that, in one of the sudden changes of public opinion to which all municipalities are more or less subject, the city might resolve to enter the field itself—a field in which it undoubtly would have become the master—and practically extinguish the rights it had already granted to the company. We think a disclaimer of this kind was within the fair intendment of the contract, and that a stipulation to that effect was such a one as the city might lawfully make, as an incident of the principal undertaking.

*Id.* 19 S.Ct. at 84.

Although the Supreme Court sanctioned this conduct based on an interpretation of the validity of contractual provisions, *Walla Walla* was decided without any consideration whatsoever of antitrust law. The Supreme Court did not discuss, mention, or even cite the Sherman Act in the decision. The Clayton Act and Robinson-Patman Act had not even been enacted at the time. Because the *Walla Walla* case was not an antitrust case, and was decided on completely different grounds, the court cannot hold that it controls the facts *sub judice*, or that it is sufficient to mandate dismissal of Plaintiffs' complaint. Defendant's motion in this regard is denied.

### D. Other Matters.

Defendant asked this court to dismiss the damages portion of the complaint, based on the Local Government Antitrust Act of 1984, which provides that damages cannot be recovered from local governments in actions filed after the Act's effective date. Although there are substantial questions as to whether or not the Local Government Antitrust Act applies in this case, the question is premature. The court sees no need to address the question of remedies until the defendant's liability has been determined. *See City of Lafayette*, 435 U.S. at 402–403, fn. 22, 98 S.Ct. at 1131, fn. 22.

In fact, both parties have indicated to the court that they would like to appeal this decision to the Eleventh Circuit as soon as the immunity ruling is issued. The court feels that there are "substantial questions of law and fact" present in this case which would allow for an interlocutory appeal under § 1292(b) of the United States Code. 28 U.S.C. § 1292(b). Because immunity has been granted in part and denied in part, the court anticipates a potential cross-appeal. If the Court of Appeals decides that the Georgia legislature contemplated even the City of Athens' activities in illegally contracting with private parties and engaging in unjust price discrimination, there will be no need for the case to proceed on to trial. If, on the other hand, the Court of Appeals agrees with Plaintiffs' argument that the defendant's activities are subject to the *Midcal* requirement because of the parochial nature of Defendant's activities, the discovery necessary to prepare for trial will take a different course. For these reasons, the court would like to give the parties the right to an interlocutory appeal if they do not agree with the court's reasoning. Because the court has ruled that Defendant is immune from antitrust attack for its contracts with other political subdivisions, Plaintiffs' Motion for Partial Summary Judgment is moot, subject to reconsideration in the event that the Court of Appeals does not agree with this court's ruling.