Bettye **WICKER**, CRNA, Plaintiff,

v.

**UNION COUNTY GENERAL HOSPITAL, et al.,** Defendants.

No. WC86–92–S–D.

United States District Court, N.D. Mississippi, W.D.

Nov. 9, 1987.

Susan M. Jenkins, Daniel S. Koch, Janet L. Pailet, Quinn, Racusin & Jenkins, Washington, D.C., Will R. Ford, Jr., New Albany, Miss., Gene A. Blumenreich, Fine & Ambrogne, Boston, Mass., for plaintiff.

Lester F. Sumners, Sumners, Carter, Trout & McMillin, P.A., New Albany, Miss., for defendants.

## OPINION

SENTER, Chief Judge.

This cause comes before the court on motion for summary judgment by defendants. For the reasons set forth below, the court denies this motion as to the demand for injunctive relief under count 1 of the complaint. The court sustains the motion as to all other counts and demands.

### FACTS

Plaintiff Bettye Wicker is a Certified Registered Nurse Anesthetist (CRNA) who

has been engaged in the practice of nurse anesthesia at UCGH for over twenty years. (The term "Certified Registered Nurse Anesthetist" or "CRNA" refers to a registered nurse, duly licensed by the state, who is certified as a nurse anesthetist by the Council on Certification of the American Association of Nurse Anesthetists.)

Defendant Union County General Hospital (Hospital)[1] is a public hospital owned and operated by Union County, Mississippi. Defendants, the individual members of the Board of Trustees of Hospital, are appointed by the elected county supervisors of Union County, Mississippi.

Under Mississippi law, nurse anesthetists, physician anesthesiologists, and dental anesthetists may administer anesthesia. Nurse anesthetists compete with such other providers in the anesthesia service market. At UCGH, anesthesia is administered by both nurse anesthetists and dental anesthetists.

Plaintiff, Ms. Wicker, has provided anesthesia services at UCGH since 1965. For the first six years of her practice there, she was an employee of the hospital. Beginning in 1971, Ms. Wicker became an independent contractor and entered into various oral or written contracts with UCGH by the terms of which she agreed to provide anesthesia services at UCGH as requested by individual surgeons, obstetricians, and patients and to share anesthesia call and coverage with other anesthesia providers at UCGH. UCGH agreed to provide billing services for her.

Prior to January, 1980, third-party payors of health care services were not required to reimburse CRNAs directly, as now required under Mississippi law. Further, the federal Medicare program does not reimburse CRNAs directly, but will reimburse hospitals for the actual cost of anesthesia services provided by CRNAs.

Under Mississippi law, nurse anesthetists were not permitted to directly bill for their services until January of 1980. Therefore, one of the terms of Ms. Wicker's various contracts with UCGH was that the hospital

would bill for her services. Under this arrangement, Ms. Wicker would submit a monthly statement of all anesthesia services rendered during that period. UCGH would then bill Ms. Wicker's patients and their third-party payors for the professional component of anesthesia services along with the hospital's own bills for the hospital component of anesthesia service. UCGH then remitted to Ms. Wicker sixty percent (60%) of the professional component charged by the hospital. Additionally, obstetrical and certain other anesthesia services provided by plaintiff to UCGH patients were reimbursed by UCGH in accordance with a fixed fee schedule.

Thurmond Beasley, D.D.S., a dental anesthetist at UCGH, also provides anesthesia services in competition with Ms. Wicker. Dr. Beasley is also an independent contractor with UCGH and utilizes a similar billing arrangement to that of Ms. Wicker. Ms. Wicker alleges that Dr. Beasley is not required to remit the same percentage of his billings to UCGH.

On or about August 18, 1985, Ms. Wicker was informed by the administration and Board of Trustees of UCGH that the hospital wished to reduce the amount of payment she was receiving for her services. The hospital administration provided her with a proposed price list and advised her that despite the reduction in payment to her represented by this list, it would continue to bill for her services at higher rates than those contained on the price list. In fact, the hospital administration would continue to bill at the previous price level. Ms. Wicker rejected the hospital's proposal. She informed the administration, and here contends, that federal Medicare regulations required that hospitals billing for the services of an independent contractor nurse anesthetist may bill *only* for the actual cost to the hospital for these services. She further informed the hospital and here contends that "percentage contracts" with providers of services other than physicians, under the terms of which the provider of services would receive less than 100 percent of the charges billed for his or her

---

1. The court will refer to the Hospital and its  trustees collectively as UCGH.

services, were prohibited under federal Medicare law and regulations.

By letter dated October 1, 1985, UCGH terminated its contract with Ms. Wicker effective January 1, 1986, and offered to negotiate a new contract. After receipt of this termination notice, Ms. Wicker entered into a contract with E.E. Bramlitt, M.D., Bruce Bullwinkel, M.D., and New Albany Surgical Group (NASG) to provide anesthesia services as an independent contractor for all of their surgical patients at UCGH except those who are recipients of Medicare. Under the terms of this contract, either Ms. Wicker or NASG would directly bill patients or their third-party payors for her services.

On November 27, 1985, Ms. Wicker informed the members of the medical staff of UCGH that beginning January 1, 1986, she would be working as an independent contractor with NASG and would also be available to provide anesthesia services to the patients of other surgeons and obstetricians at UCGH upon their request. On that same date, Ms. Wicker's attorney informed the board that she did not wish to renegotiate the contract, but would work as an independent contractor directly with physicians.

Since January 1, 1986, UCGH has submitted several proposed contracts to Ms. Wicker. Ms. Wicker has rejected all of these since each draft contains a provision which would require Ms. Wicker to remit to UCGH a portion of her anesthesia service billings or would allow UCGH to retain a percentage of such fees. UCGH has refused to consider any contract with Ms. Wicker which does not include a provision permitting UCGH to receive some share of Ms. Wicker's fees, despite the fact that UCGH itself legitimately bills for the hospital component of anesthesia which typically includes charges for equipment, drugs, and supplies utilized in providing anesthesia services.

In January, 1986, Ms. Wicker learned that, contrary to prior representations made to her by UCGH, Dr. Beasley is paid the full amount of the professional component with respect to his anesthesia services and is not required to remit any portion of his billings or fees to UCGH.

UCGH has since employed another CRNA, Philip Thompson, who functions as a hospital employee. Ms. Wicker has expressed her willingness to rotate with the other anesthesia providers in taking calls for emergency anesthesia services. However, she is unwilling to provide, entirely on her own, 24–hour–a–day, 7–day–a–week coverage for all emergency anesthesia services.

On February 27, 1986, UCGH filed an action for declaratory judgment in Union County Chancery Court. The complaint asked the court to declare:

a) Whether [Hospital] has the right to prohibit the private practice of anesthesia by C.R.N.A.'s.

b) Whether [Bettye Wicker] and other C.R.N.A.'s, otherwise qualified but not employees of [Hospital], are entitled to staff privileges and the right to render anesthesia services at the request of patients or physicians.

c) Whether staff physicians, surgeons, and dentists are entitled to employ and bring into the hospital [Wicker] and other C.R.N.A.'s who are otherwise qualified but not employed by [Hospital].

d) If the court should find that [Wicker] and other C.R.N.A.'s have the right to practice independently or that physicians may employ private duty C.R.N.A.'s, the court should declare:

i) Whether [Hospital] can charge the physician or patient for what [Hospital] has lost by the non-use of its own anesthesia personnel;

ii) Whether [Hospital] can require an independent C.R.N.A. to provide standby coverage;

iii) Whether [Hospital] can require a physician using an independent or private duty C.R.N.A. to indemnify [Hospital] against any losses, expenses, or damages in any way attributable to the C.R.N.A.

On July 1, 1986, Wicker filed a complaint against Hospital and its trustees (both individually and in their official capacities) with

this court. The complaint contained six counts: Count 1 alleges that the acts of UCGH constitute an attempt to monopolize the market for anesthesia services under 15 U.S.C. § 2 and demands injunctive relief or a declaratory judgment against termination of privileges, monetary damages (including treble damages under 15 U.S.C. § 16), and costs and attorney's fees. Count 2 alleges that UCGH has threatened to deprive Wicker of a property or liberty interest under color of state law without due process and demands injunctive relief, costs, and attorney's fees under 42 U.S.C. § 1983. Count 3 alleges that UCGH has remitted only a portion of anesthesia charges billed to Medicare and other third party payors and demands a declaratory judgment that such practice violates the Medicare fraud provisions (42 U.S.C. §§ 1395nn, 1395xx) and seeks injunctive relief against continuation of that policy. Count 4 alleges that UCGH and its board of trustees constitute a trust and combine under Mississippi Code Annotated § 75–21–1 and that their acts constitute an attempt to monopolize under § 75–21–3 and demands injunctive relief, damages, plus costs and attorney's fees. Count 5 alleges that the acts of UCGH and its board constitute tortious interference with contractual relations and demands $5,000.00 in damages, injunctive relief, plus costs and attorney's fees. Count 6 alleges that UCGH compensated another anesthesiologist at a higher rate than Wicker in violation of the contract between Wicker and UCGH and demands $428,563.67 in damages and interest, costs, and attorney's fees.

On July 3, 1986, Wicker filed an answer and counterclaim in the Union County Chancery Court. The counterclaim stated "and reserving all federal claims as she has presented in the United States District Court for the Northern District of Mississippi, in Cause Number WC86–92." The counterclaim states three counts. Count one states the same cause of action and demands the same relief as the state antitrust claim in count 4 of the federal complaint. Count two corresponds to the tortious interference with a business relationship claim in count 5 of the federal com-

plaint. Count three of the counterclaim corresponds to the breach of contract claim in count 6 of the federal complaint.

On September 4, 1986, Wicker applied to this court for a preliminary injunction against continued prosecution of the action in the Union County Chancery Court. On September 15, 1986, this court denied the motion for preliminary injunction on the grounds that there was no threat of irreparable harm to Wicker and that such an injunction was forbidden under 28 U.S.C. § 2283.

On March 20, 1987, the Chancery Court of Union County entered a decree. The chancellor found that UCGH had the right to require all individuals seeking to work within the hospital as anesthetists or anesthesiologists to sign a contract with the hospital and a concomitant right to deny the privilege of practicing within the hospital to those who refuse. The chancellor found that UCGH's denial of privileges did not constitute tortious interference with a business relationship. The chancellor found that UCGH had violated the prior contract with Wicker and awarded $10,392.00 as damages on that claim. The chancellor found that UCGH is exempt from the Mississippi Trust and Combines Act because of its governmental ownership and that the acts of UCGH did not constitute a conspiracy or combination to restrain trade, hinder competition, limit the production of anesthesia services, or dictate the conduct of Wicker's business. The chancellor noted Wicker's contention that the proposed contract violated Medicare fraud provisions but stated that no proof had been offered on this point.

## CONCLUSIONS OF LAW

### PRECLUSION

■ The primary question before this court concerns the extent of preclusive effect which this court must accord the decree of the Chancery Court of Union County. Under 28 U.S.C. § 1738, this court must accord the decision of the Chancery Court precisely the same preclusive effect as would a sister court of the State of

Mississippi. *Marrese v. American Academy of Orthopedic Surgeons*, 470 U.S. 373, 380–81, 105 S.Ct. 1327, 1331–33, 84 L.Ed.2d 274, 281–82 (1985). Consequently, this court must consider the Mississippi doctrines of res judicata and collateral estoppel and not the similar federal doctrines of claim and issue preclusion.

### Res Judicata

■ A claim is barred by res judicata if it presents four identities:

(1) identity of the subject matter of the original action when compared with the action now sought to be precluded; (2) identity of underlying facts and circumstances upon which a claim is asserted and relief sought in the two actions; (3) identity of the parties to the two actions, an identity met where a party to the one action was in privity with a party to the other; and (4) identity of the quality or character of a person against whom the claim is made.

*Walton v. Bourgeois*, 512 So.2d 698 (Miss. 1987); *Dunaway v. W.H. Hopper and Associates, Inc.*, 422 So.2d 749 (Miss.1982). Such identity clearly exists in this cause. Complete identity exists between count 4 of the federal complaint and count 1 of the chancery counterclaim; between count 5 of the federal complaint and count 2 of the chancery counterclaim; and between count 6 of the federal complaint and count 3 of the chancery counterclaim. The claims of conspiracy and monopolization under the Mississippi Trusts and Combines Act, of tortious interference with a contractual relationship and of breach of contract are, therefore, barred by the decree of the Chancery Court of Union County.

■ Res judicata applies not only to all claims actually litigated, but also all claims which could have been litigated and decided in that suit. *Dunaway v. W.H. Hopper and Associates, Inc.*, 422 So.2d 749 (Miss.1982); *Standard Oil Co. v. Howell*, 360 So.2d 1200 (Miss.1978). The claim of monopolization under 15 U.S.C. § 2 could not have been brought in the chancery court. *See* 15 U.S.C. § 15; *Freeman v. Bee Machinery Co.*, 319 U.S. 448, 63 S.Ct.

1146, 87 L.Ed. 1509 (1943); *reh'g denied*, 320 U.S. 809, 64 S.Ct. 27, 88 L.Ed. 489 (1943). That claim is not barred under the res judicata doctrine by the chancery decision. However, both the claim under 42 U.S.C. § 1983 and the requested declaratory judgment could have been brought in the chancery action. Failure to bring these claims in the state forum may preclude them under state law even though the § 1983 claim is constitutionally based. *See Migra v. Warren City School District Board of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (permitting claim preclusion of a 1983 action if in accordance with Ohio law); *Kutzik v. Young*, 730 F.2d 149 (4th Cir.1984) (permitting claim preclusion of section 1983 wrongful termination action under Maryland law).

Wicker contends that res judicata is inapplicable because the state law claims and 42 U.S.C. § 1983 are distinct causes of action. The Supreme Court of Mississippi ruled in *Bourgeois* that the requirement of identity of cause of action means "identity of underlying facts and circumstances upon which a claim is asserted and relief sought in the two actions." *Walton v. Bourgeois*, 512 So.2d 698 (Miss.1987). In *Bourgeois*, a tort action for failure to perform a surgical procedure barred a contract action on the same procedure. In this cause, both UCGH's declaratory judgment action and Wicker's § 1983 claim seek to establish whether Wicker had a protectable property interest in practice with UCGH. Both Wicker's § 1983 claim and Wicker's tortious interference with a business relationship claim seek damages, injunctive relief, costs, and attorney's fees and both arise from UCGH's attempt to bar non-employee anesthetists from practice. Under *Bourgeois*, the § 1983 and the state court causes of action are identical.

■ Wicker contends that the section 1983 claim is protected from the preclusive effect of the chancery court decision under *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Wicker argues that this court's refusal under 28 U.S.C. § 2283 to enjoin the proceedings in the

chancery court was the effective equivalent of abstention by this court. Wicker further argues that because the filing of her complaint in federal court preceded the filing of her answer and counterclaim in state court, she is placed in essentially the same position as the plaintiff in *England*. In refusing to enjoin the chancery court proceedings, this court noted that section 1983 actions are within the exceptions to 28 U.S.C. § 2283. Having so noted, this court did not abstain as to the federal antitrust and section 1983 claims. Rather, this court examined the proposed injunction in light of *Canal Authority v. Callaway*, 489 F.2d 567 (5th Cir.1974), and found that the injunction was not justified because Wicker failed to show that the acts of UCGH threatened irreparable harm to her.

Nor can the court's refusal to enjoin on the other four counts be considered abstention. *Hartke v. Roudebush*, 321 F.Supp. 1370 (S.D.Ind.1970), suggested that 28 U.S.C. § 2283 was a mere "statutory adoption of the doctrine of comity and hence discretionary in its application." *Hartke*, 321 F.Supp. at 1372. This position was clearly rejected by the Supreme Court of the United States in *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). The Court relied on a prior ruling that 28 U.S.C. § 2283 was "an *absolute* prohibition against enjoining state court proceedings, *unless* the injunction falls within one of three specifically defined exceptions." *Mitchum*, 407 U.S. at 229, 92 S.Ct. at 2155, 32 L.Ed.2d at 710. (Emphasis added.) The exceptions are that injunction under a statute is expressly authorized by Congress, that the injunction is necessary in aid of the court's jurisdiction, and that the injunction is necessary to protect or effectuate the court's judgments. The state law and declaratory judgment questions come under none of these exceptions. This court was absolutely barred from considering injunction based on the other four claims and did not abstain.

In the absence of abstention, the Supreme Court has clearly allowed full preclusive effect to state court judgments. *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Wicker's section 1983 claim is precluded by the chancery court's judgment. In summary, the Mississippi law of res judicata precludes all of Wickers' claims except that under 15 U.S.C. § 2.

### Collateral Estoppel

■ UCGH contends that Wicker's claim under 15 U.S.C. § 2[2] is collaterally estopped by the findings of the chancery court under the Mississippi Trust and Combines Act.[3] For an issue to be collaterally

**2.** 15 U.S.C. § 2 states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

**3.** Miss.Code Ann. § 75–21–1 states: "A trust or combine is a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be:
"(a) To restrain trade;
"(b) To limit, increase or reduce the price of a commodity;
"(c) To limit, increase or reduce the production or output of a commodity;

"(d) To hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity;
"(e) To engross or forestall a commodity;
"(f) To issue, own or hold the certificate of stock of any trust and combine within the spirit of this chapter knowing it to be such at the time of the issue or the acquisition or holding such certificate; or
"(g) To place the control to any extent of business or of the proceeds or earnings thereof, contrary to the spirit and meaning of this chapter, in the power of trustees, by whatever name called; or
"(h) To enable or empower any other person than themselves, their proper officers, agents and employees to dictate or control the management of business, contrary to the spirit and meaning of this chapter; or
"(i) To unite or pool interest in the importation, manufacture, production, transportation, or price of a commodity, contrary to the spirit and meaning of this chapter.

estopped, the specific issue must have been actually litigated in, determined by, and essential to the judgment in the former action. *Dunaway*, 422 So.2d at 751. In this cause, the chancery court found that UCGH was immune from liability under the act. Consequently, that court's findings as to the relevant market and the effect of UCGH's acts on competition were not essential to the judgment and do not preclude the issue.

## ANTITRUST IMMUNITY

UCGH first contends that it is immune from all antitrust liability for its acts under the state action doctrine as enunciated in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). Alternatively, UCGH contends that it is immune from damages, attorney's fees, and costs under the Local Government Antitrust Act of 1984. *See* 15 U.S.C. §§ 34–36.

### The "state action" exemption does not apply.

■ UCGH argues that it is immune from antitrust liability under the state action doctrine.

UCGH relies upon *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) [hereinafter *Hallie*], *Coastal Neuro–Psychiatric Associates, P.A. v. Onslow County Hospital Authority*, 795 F.2d 340 (4th Cir.1986) [hereinafter *Coastal*], *Ambulance Service of Reno, Inc. v. Nevada Ambulance Services, Inc.*, 819 F.2d 910 (9th Cir.1987); *Woolen v. Surtran Taxicabs, Inc.*, 801 F.2d 159 (5th Cir.1986); and *Mercy Ambulance, Inc. v. County of San Mateo*, 791 F.2d 755 (9th Cir.1986). *Hallie* recited that immunity under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the original of the state action doctrine, must be analyzed under a two-prong test. The court must look to see if the acts of UCGH were pursuant to a clearly articulated state policy to dis-

"Any corporation, domestic or foreign, or any partnership, or individual, or other association, or person whatsoever, who are now, or shall hereafter create, enter into, become a member of, or a party to any trust or combine as hereinabove defined shall be deemed and adjudged guilty of a conspiracy to defraud and shall be subject to the penalties hereinafter provided. Any person, association of persons, corporation, or corporations, domestic or foreign, who shall be a party or belong to a trust and combine shall be guilty of crime and upon conviction thereof shall, for a first offense be fined in any sum not less than one hundred dollars ($100.00) nor more than five thousand dollars ($5,000.00) and for a second or subsequent offense not less than two hundred dollars ($200.00) nor more than ten thousand dollars ($10,000.00, and may be enjoined by a final decree of the chancery court, in a suit by the state on the relation of the attorney general, from the further prosecution of or doing of the acts constituting the trust and combine as defined in this chapter."
Miss.Code Ann. § 75–21–3 states: "Any corporation, domestic or foreign, or individual, partnership, or association of persons whatsoever, who, with intent to accomplish the results herein prohibited or without such intent, shall accomplish such results to a degree inimicable to public welfare, and shall thus:
"(a) Restrain or attempt to restrain the freedom of trade or production;
"(b) Or shall monopolize or attempt to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business;
"(c) Or shall engross or forestall or attempt to engross or forestall any commodity;
"(d) Or shall destroy or attempt to destroy competition in the manufacture or sale of a commodity, by selling or offering the same for sale at a lower price at one place in the state than another or buying or offering to buy a commodity at a higher price at one place in the state than another, differences of freight and other necessary expenses of sale and delivery considered;
"(e) Or shall destroy or attempt to destroy competition by rendering any service or manipulating, handling or storing any commodity for a less price in one locality than in another, the differences in the necessary expenses of carrying on the business considered, shall be deemed and held a trust and combine within the meaning and purpose of this section, and shall be liable to the pains, penalties, fines, forfeitures, judgments, and recoveries denounced against trusts and combines and shall be proceeded against in manner and form herein provided, as in case of other trusts and combines.
"It shall be sufficient to make out a prima facie case of a violation of subdivision (e) of this section to show lower charge for the service therein mentioned in one locality than in another, or to show a higher price paid for a commodity in one locality than another, differences of freight and other necessary expenses of operating business considered."

place competition with regulation or monopoly and whether the state "actively supervises" the activity.

### Clearly Articulated State Policy

To obtain state action immunity, a municipality must be able to show that it acted pursuant to " 'clearly articulated and affirmatively expressed ... state policy' " "to displace competition with regulation or monopoly public service." *Hallie,* 471 U.S. at 39, 105 S.Ct. at 1716–17 (citations omitted). UCGH points to a series of statutory provisions which it contends meet this standard.

Section 73–25–93, Miss.Code Ann. (1972), is the only provision cited by defendants which pertains to termination of clinical privileges, and it relates solely to the medical staff, not to a non-physician member of the medical staff such as Ms. Wicker. Nor do defendants allege that Ms. Wicker's privileges were withdrawn for any of the disciplinary reasons enumerated in that section.

All of the other statutory provisions cited by defendants as authorizing their actions came from section 41–13–35, Miss.Code Ann. (1972). This statute was passed as part of an overall statutory package, Miss. Laws section 1, *et seq.,* ch. 511, 1985, designed to "clarify and expand the power of boards of trustees of community hospitals so as to allow such community hospitals to operate efficiently, to offer *competitive health care services* to respond more effectively to new developments and regulatory changes in the health care area and to continue to serve and promote the health and welfare of the citizens of the State of Mississippi. *This act shall be liberally construed so as to give effect to such intent and purpose." Id.,* section 1 (emphasis supplied).

The other powers cited by UCGH, e.g., the power to lease medical offices at appropriate rates, to recruit and pay health care providers, and enter joint ventures with other hospitals, are completely consonant with the express legislative policy of promoting "competitive health care services" at community hospitals.

UCGH's reliance upon *Coastal* is misplaced. The North Carolina statute in *Coastal* authorized the hospital to restrict access of physicians to assure, *inter alia,* "appropriate utilization of hospital facilities." *Coastal,* 795 F.2d at 340. There is no analogous provision in Mississippi law allowing community hospitals to terminate medical staff members for such generalized reasons. Rather, as to physician medical staff members, the statute authorizes termination of staff privileges only for stringent disciplinary reasons. Miss.Code Ann. § 73–25–93 (1972). The Mississippi legislature is *silent* as to the termination of privileges of non-physician staff members.

Each of the other cases cited involve similar competition excluding statutes. The Mississippi legislative scheme is simply different: it authorizes no exclusion of competing providers and recites that it should be construed liberally to ensure competitive health care services. UCGH has failed to show that Mississippi articulated a state policy to displace competition with regulation or monopoly as is required to sustain the state action defense under *Hallie.* UCGH has established, at most, neutrality by the state toward competition limiting actions. The requirement of state action is not met by showing mere neutrality. *See Sterling Beef Co. v. City of Fort Morgan,* 810 F.2d 961 (10th Cir.1987); *Reazin v. Blue Cross and Blue Shield,* 663 F.Supp. 1360 (D.Kan.1987).

### Active Supervision By State

Generally, the second requirement for state action immunity is active supervision by the state government; however, a municipality, unlike a private party, need *not* show that its challenged practices were actively supervised by the state. *Hallie,* 471 U.S. at 46–47, 105 S.Ct. at 1720. In *324 Liquor Corp. v. Duffy,* ––– U.S. –––, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987), the Court found that the anticompetitive activity was not immune as "state action" because there was no active supervision by the state. *324 Liquor* is easily distinguishable from *Hallie* and the cause *sub judice.* In *324 Liquor,* the statute required a state agency to enforce anticompetitive standards set by private parties. Consequently, the actual price setting party in *324 Liquor* was a

nongovernmental entity. In *Hallie,* the Court exempted municipalities from the active supervision requirement because "where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals."

Here, the Hospital and its board are themselves governmental agencies. The trustees on the board are appointed to limited terms by elective representatives of the people. *See* Miss.Code Ann. § 41–13–29 (1985). Consequently, the board and Hospital more closely resemble the municipality in *Hallie* in that they are presumptively acting in a public capacity, and active supervision need not be shown. However, we here face precisely the conflict foreseen in *Hallie* between a "purely parochial public interest"—(the ability of the local hospital board to meet its debt schedule)—and "more overriding state goals" (the legislature's desire in the health code to insure "competitive health services"). In summary, because UCGH failed to show that its acts were pursuant to an affirmatively articulated state policy, the acts are not state actions. This is true even though active supervision need not be shown because UCGH is functionally equivalent to a municipality.

**The Local Government Antitrust Act**

■ Section 35(a) of 15 U.S.C. immunizes local governmental entities (including special function government entities—*see* 15 U.S.C. § 34(1)(A)) and officials acting in their official capacity from imposition of damages, interest on damages, costs or attorney's fees. The section does not immunize such entities from injunctive relief under 15 U.S.C. § 26 or costs and attorney's fees imposed thereunder. The decision of the chancellor found that the actions of the board were reasonable and not arbitrary or capricious. This finding precludes a ruling that the individual actions of the board members were outside of their official capacity. Consequently, the antitrust claim can proceed solely for equitable relief.

**CONCLUSION**

For the reasons stated above, the court sustains defendants' motion for summary judgment as to all claims except that seeking injunctive relief from acts in violation of 15 U.S.C. § 2.

An appropriate order shall issue.

**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For reasons set forth in an accompanying opinion, the court sustains the defendants' motion for summary judgment as to counts 2, 3, 4, 5, and 6 of the complaint. The court also finds that the hospital and its board of trustees in their official capacity are immune from damages under 15 U.S.C. § 36(a). Claims against the members of the board in their individual capacity are precluded by the finding of the Chancery Court of Union County that the actions of the board were reasonable and not arbitrary or capricious. Consequently, the action may proceed on 15 U.S.C. § 26 alone.