Deborah SWEENEY, Plaintiff,

v.

ATHENS REGIONAL MEDICAL CENTER, et al., Defendants.

Civ. No. 87–06–ATH(DF).

United States District Court,
M.D. Georgia,
Athens Division.

Feb. 3, 1989.

Mary M. Brockington, John C. Butters, A. Jack Hinton, Douglas R. Powell, McGee & Oxford, Atlanta, Ga., James F. Ponsoldt, Athens, Ga., for plaintiff.

Emmet J. Bondurant, Michael B. Terry, Bondurant, Mixson & Elmore, Atlanta, Ga., Gary B. Blasingame, Blasingame, Burch, Garrard & Bryant, J. Edward Allen, Fortson, Bentley & Griffin, Athens, Ga., for defendant Athens Regional Medical Center.

Sidney F. Wheeler, Earl W. Gunn, Suzanne M. Trexler, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., for defendants Athens Obstetrics and Gynecology, P.C., et al.

Terrance C. Sullivan, Hart & Sullivan, Atlanta, Ga., for defendants Athens Women's Clinic, et al.

Lynn M. Roberson, Swift, Currie, McGhee & Hiers, Atlanta, Ga., for defendant Thomas C. Lyons, M.D.

FITZPATRICK, District Judge.

Plaintiff Deborah Sweeney, a certified nurse-midwife, brought the above-referenced action against the Athens Regional Medical Center (ARMC), the Athens Women's Clinic (AWC), Athens Obstetrics and Gynecology, P.C. (AO & G), and several doctors who are connected with AWC and AO & G. In her original Complaint, Plaintiff alleged violations of the Sherman Act, 42 U.S.C.A. § 1983, and various provisions of State law. ARMC, AWC and its doctors, and AO & G and its doctors, have each filed motions for summary judgment as to

all claims asserted by Plaintiff Sweeney. After initially considering all three motions, the court realized that the motions filed by the two groups of doctors involve similar claims and defenses, whereas the motion filed by ARMC involves, for the most part, entirely different claims and defenses. For this reason, as well as to give the parties the court's rulings as soon as they have been reached, the court has decided to address ARMC's motion for summary judgment in this Order and to address the motions of AWC and AO & G in a separate Order.

## I. INTRODUCTION

In her seven-count Complaint, Plaintiff Sweeney asserted three claims against ARMC: (1) a Sherman Act claim; (2) a claim under 42 U.S.C.A. § 1983 for an alleged violation of her constitutional right to free speech; and (3) a claim under Georgia law for intentional infliction of emotional distress. ARMC has moved for summary judgment on all three claims. Before discussing the merits of these claims, the court will set forth those facts relevant to Ms. Sweeney's claims against ARMC.

## II. BACKGROUND

After obtaining her masters degree in nurse-midwifery at Georgetown University in 1982, Plaintiff Sweeney worked as a labor and delivery nurse both at ARMC and at another local hospital in Athens, Georgia. During this time she held staff privileges at both hospitals. Affidavit of Deborah Sweeney, ¶ 2, and Exhibit B to this Affidavit. She also worked as a midwife in the ARMC midwifery clinic, and as an instructor in obstetrics nursing for the Medical College of Georgia (MCG) School of Nursing at Athens (SONAT) program at ARMC. *Id.* As part of her duties with the SONAT program, Ms. Sweeney supervised student nurses during their obstetrics/gynecology clinical rotation at ARMC. *Id.* at ¶ 8. Ms. Sweeney is licensed by the State of Georgia as a registered nurse and is certified as a nurse-midwife by the American College of Nurse Midwives, the national certifying body recognized by the Geor-

gia Board of Nursing. Deposition of Deborah Sweeney, pp. 110–11, 114–16, 134 (hereinafter Sweeney Dep.).

Defendant ARMC, formally known as the Hospital Authority of Clarke County, is a public corporation created under the laws of the State of Georgia. ARMC is supported by public funds and operates exclusively as a not-for-profit entity. Affidavit of John Drew, ¶ 4; O.C.G.A. § 31–7–77 (1985). Pursuant to the Hospital Authorities Law, O.C.G.A. § 31–7–70 *et seq.*, ARMC exercises a variety of powers, including but not limited to, making and executing contracts, establishing rates and charges for services and the use of its facilities, and appointing its officers, agents, and employees. O.C.G.A. § 31–7–75(3), (10), (18) (1985). Moreover, ARMC has been empowered to grant or deny privileges, and to revoke the privileges of those licensed medical practitioners who treat patients at the Hospital. O.C.G.A. § 31–7–7(a), (b) (1985).

The Defendant doctors are independent contractors. Although the doctors hold staff privileges at ARMC, they are neither employees nor agents of the Hospital. The patients at ARMC are the private patients of the doctors, and the doctors act as agents for their patients in making medical and other health-related decisions. Deposition of John Drew, President of ARMC, p. 72 (hereinafter Drew Dep.).

In the spring of 1985, Ms. Sweeney established a private business called "Family Birth." Sweeney Dep., pp. 13, 23. "Family Birth" provided a childbirth alternative to women in the Athens, Georgia area. The purpose of "Family Birth" was to have nurse-midwives, not doctors, provide prenatal care and complete assistance during the delivery. According to certain affidavits in the record, "Family Birth" provided a less expensive method for childbirth. Because the only role for doctors in the "Family Birth" program was to provide "back-up," Ms. Sweeney limited her service to low-risk patients. *Id.* at pp. 13, 23.[1]

---

**1.** Under state regulations, a certified nurse-midwife must practice within a health care system providing for medical consultation, collabora-

tive management, and referral. This system is generally referred to as "back-up." *See* Rules

In the summer of 1985, Ms. Sweeney placed an advertisement for "Family Birth" in a local newspaper. Ms. Sweeney received a favorable response from this advertisement. As a result of increased responsibilities in connection with "Family Birth," Ms. Sweeney decided to reduce her teaching load at MCG to half-time beginning in January of 1986. *Id.* at pp. 89–91.

Each woman using the "Family Birth" program was required to make their own arrangements with a physician for back-up consultation and referral. From the spring of 1985 until the fall of 1985, Dr. Kaushik Shah served as the "back-up" physician for at least some of Ms. Sweeney's clients. *Id.* at pp. 30–33. In September of 1985, however, shortly after Ms. Sweeney had advertised "Family Birth" in a local newspaper, Dr. Shah discontinued his practice as "back-up" for Ms. Sweeney's clients. *Id.*

From the fall of 1985 until the summer of 1987, Dr. George Rohrer provided back-up for Ms. Sweeney's home deliveries. *Id.* at p. 38. During the time that Dr. Rohrer provided back-up for Ms. Sweeney's clients, he was employed by the Northeast Georgia Medical Center, a federally-funded clinic located in Clarke County. Dr. Rohrer, who moved from the Athens area in the summer of 1987, was not connected with either AWC or AO & G.

In the fall of 1985, at about the same time Dr. Shah discontinued his back-up services for Ms. Sweeney's clients, the doctors comprising the Department of Obstetrics at ARMC and the doctors comprising the Department of Obstetrics at St. Mary's Hospital met jointly to discuss Ms. Sweeney's "Family Birth" business. As a result of this meeting, the Chief of the Department of Obstetrics for ARMC, Defendant Kelley, and the Chief of the Department of Obstetrics for St. Mary's, Defendant Hardman, wrote a joint letter which they mailed to the chief administrators at each of the two Athens' Hospitals. The letter, dated November 19, 1985, began as follows:

> We have in our community a medical practice that we, as obstetricians, feel must be eliminated. Amy Hathaway,

and Regulations of Georgia Board of Nursing,

CNM, and Debbie Sweeny [sic], CNM, are doing home deliveries without qualified physician supervision....

Letter from Dr. Robert E. Kelley, Jr. and Dr. William J. Hardman, Jr., dated Nov. 19, 1985 (a copy of the letter is attached as Plaintiff's Exhibit 1 to John Drew's deposition). Apparently, the doctors' belief that Ms. Sweeney did not have "qualified physician supervision" was based on the fact that none of the doctors at the joint meeting had provided back-up for Ms. Sweeney's clients.

The November 19th letter was written on the stationery of the Defendant doctors practicing at AWC. At the time the letter was written, the AWC doctors also discussed whether to allow Ms. Sweeney and her students to have contact with those hospital patients who were under the care of the AWC doctors at ARMC.

Subsequently, on January 16, 1986, at the nurses' station of the labor and delivery unit at ARMC, Defendant Mercer allegedly accused Ms. Sweeney of (1) practicing illegal medicine; (2) practicing without a back-up physician; (3) exposing patients to unnecessary risks; (4) failing to inform patients of risks; (5) being poorly trained as a midwife; and (6) being irresponsible for the welfare of her patients. Complaint, ¶ 21. According to Ms. Sweeney, Defendant Mercer made her accusations in the presence of several people including nurses, SONAT students, and patients. *Id.*

Shortly after the confrontation between Dr. Mercer and Ms. Sweeney, the doctors of AWC, Defendants R. Smith, Kelley, L. Smith, Mercer, and Lyons, agreed to prohibit Ms. Sweeney and her students from having access to patients under their care at ARMC. Deposition of Cynthia A. Mercer, M.D., pp. 36–37 (hereinafter Mercer Dep.). These doctors communicated their agreement to ARMC orally, and confirmed the agreement in writing. The letter, dated February 5, 1986, stated:

> ... we simply cannot allow [our patients] to be exposed to students who are being

410–12–.03.

instructed by one who advocates the home delivery concept.

Letter from Drs. R. Smith, L. Smith, Lyons and Mercer to Mr. Martin Sparks, Director of Nursing of ARMC, dated Feb. 5, 1986 (a copy of the letter is attached as Plaintiff's Exhibit 4 to Dr. Mercer's deposition).

According to Ms. Sweeney, the doctors at AWC wanted to force her out of ARMC since she had a competing home birth business. The Defendant doctors contend that they took this action because Ms. Sweeney was espousing home birth to their patients. Mercer Dep. at p. 114. Ms. Sweeney denies this allegation, and testified that she only had one conversation with a patient about home birth. Sweeney Dep., pp. 163–64. The Defendant doctors also contend that Ms. Sweeney's alleged actions in espousing home birth to their patients led to a serious disruption of the functioning of the OB/GYN ward at the Hospital. *See* Deposition of John F. Elder, M.D., pp. 36–37.

When presented with the request by the AWC doctors that their patients not be treated by Ms. Sweeney or her students, ARMC officials agreed to enforce the request. Thus, ARMC refused to allow Ms. Sweeney or her students access to patients under the care of Defendants R. Smith, Kelley, L. Smith, Mercer, or Lyons, or to patients of ARMC's midwifery clinic during those ten months of the year when these Defendant doctors were on call for the midwifery clinic. Ms. Sweeney contends that this action was in violation of the contract existing between MCG and ARMC under which the Hospital was obliged to "provide adequate clinical facilities for students ..." *See* Letter from Mary E. Conway, Ph.D., Dean of the Medical College of Georgia, to John Drew, dated Mar. 7, 1986 (a copy of the letter is attached as Plaintiff's Exhibit 6 to Dr. Mercer's deposition).

Although Ms. Sweeney had been denied access to the patients of the AWC doctors at ARMC, she remained as an instructor in the SONAT program and was allowed access to other OB/GYN patients at the Hospital. Sweeney Dep., pp. 88–91, 628–40. The record shows, however, that the AWC doctors attended over ninety percent of all births at ARMC. Consequently, there were few other patients for Ms. Sweeney to see at the Hospital. *Id.* at pp. 639–40. Ms. Sweeney contends that the denial of access to Hospital patients under the care of the AWC doctors and patients in the midwifery clinic foreclosed her and her students from access to enough patients for meaningful clinical instruction. Affidavit of Deborah Sweeney, ¶ 8.

Eventually, MCG transferred Ms. Sweeney to St. Mary's. Sweeney Dep., pp. 323–24. This transfer was met with adverse pressure from the Defendant doctors practicing at AO & G, Defendants Hardman, Herrin, Hill, Crosby, and Elder. These doctors, who had been in contact with the AWC doctors at joint monthly meetings, informed St. Mary's that they did not want Ms. Sweeney or her students to have access to patients under their care at St. Mary's. Deposition of John F. Elder, M.D., pp. 35–36.

According to Ms. Sweeney, when she first inquired about teaching at St. Mary's, she was told that she would not be permitted to teach. Sweeney Dep., pp. 338–39. On December 8, 1986, however, after receiving a letter dated December 1, 1986, from Ms. Sweeney's attorney threatening litigation if Ms. Sweeney was not allowed to teach, St. Mary's reversed its earlier decision and announced that it had decided to allow Ms. Sweeney to teach at its facility. *Id.* at p. 340.

At some point during 1988, after this suit had been filed, Ms. Sweeney applied to ARMC for staff privileges. ARMC's bylaws require one applying for staff privileges to be either an employee of the Hospital or an employee of a member of the medical staff. Affidavit of Deborah Sweeney, ¶¶ 3–4. Since at the time Ms. Sweeney applied for staff privileges she was neither a Hospital employee nor an employee of a member of the medical staff, her application was denied. ARMC denied the application in 1988 even though Ms. Sweeney had held staff privileges as a certified nurse-

midwife at ARMC in 1984. *Id.* at ¶ 2.[2]

## III. DISCUSSION

### A. *The Sherman Act Claim*

Ms. Sweeney contends that ARMC conspired with the doctors of AWC and AO & G to eliminate her from conducting her "Family Birth" business. Ms. Sweeney asserts that ARMC furthered the elimination effort when it enforced the doctors' refusal to allow her or her students to have contact with certain patients at the Hospital. To add further support to her antitrust claim, Ms. Sweeney contends that the Department of Obstetrics of ARMC had a written policy forbidding staff privileges to any obstetrician who participated in or provided backup for home births. According to Ms. Sweeney's Complaint, this anticompetitive conduct on the part of ARMC adversely affected her independent birth business by damaging her professional reputation and by denying her access to those who could be considered potential clients or sources of client referrals.

■ ARMC argues that it is immune from Ms. Sweeney's antitrust claims under the Local Government Antitrust Act of 1984 (the Act), and the "state action exemption" doctrine established by the Supreme Court in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The court will discuss each of these immunity defenses separately.[3]

1. Local Government Antitrust Act of 1984

■ In 1984, Congress passed the Local Government Antitrust Act which provides in pertinent part:

> No damages, interest on damages, costs, or attorney's fees may be recovered under section 15, 15a, or 15c of this title from any local government, or official or employee thereof acting in an official capacity.

15 U.S.C.A. § 35(a) (Supp.1988). If the Act is to apply in this case, the court must first find that ARMC is a "local government" as that term is contemplated in the statute. The term "local government" is defined in the Act as "a school district, sanitary district, or any other special function governmental unit established by State law ...." 15 U.S.C.A. § 34(1)(B) (Supp.1988).

ARMC is a public hospital authority organized under the Georgia Hospital Authorities Law. The Hospital Authorities Law was enacted to establish "in and for each county and municipal corporation of the state a public body corporate and politic to be known as the 'hospital authority' of such county or city ...." O.C.G.A. § 31-7-72 (1985). ARMC operates as a not-for-profit public corporation and is "deemed to exercise public and essential governmental functions and shall have all the powers necessary or convenient to carry out and effectuate the purposes and provisions of [the Hospital Authorities Law]." O.C.G.A. §§ 31-7-75, 77 (1985).

---

**2.** The staff privileges Ms. Sweeney held in 1984 ended at the time she voluntarily terminated her employment with ARMC. The record indicates that Ms. Sweeney terminated her employment in 1984 for reasons unrelated to the facts at issue in this case. Sweeney Dep., pp. 642–43.

**3.** Ms. Sweeney contends that ARMC waived these two defenses because it did not assert them in its original answer. At a status conference held on July 19, 1988, however, ARMC requested that it be allowed to assert these defenses through a motion for summary judgment. At that time, counsel for Ms. Sweeney had no objection to ARMC filing its motion for summary judgment and asserting its defenses therein. Counsel for Ms. Sweeney has fully responded to ARMC's motion for summary judgment, and consequently, cannot complain of a lack of notice. According to a very recent

case out of the Eleventh Circuit, Rule 8(c) of the Federal Rules of Civil Procedure requires only that the opposing party have notice of the affirmative defenses the moving party wishes to raise. *Hassan v. United States Postal Serv.,* 842 F.2d 260, 263 (11th Cir.1988). In addition, other courts have allowed the local governmental immunity defense and the state action exemption defense to be raised very late in the proceedings. *See Bolt v. Halifax Hosp. Medical Center,* 851 F.2d 1273 (11th Cir.1988) (state action immunity reasserted *after* oral argument on appeal); *Woolen v. Surtran Taxicabs, Inc.,* 615 F.Supp. 344 (N.D.Tex.1985), *aff'd,* 801 F.2d 159 (5th Cir.1986), *cert. denied,* 480 U.S. 931, 107 S.Ct. 1567, 94 L.Ed.2d 759 (1987) (Local Government Antitrust Act immunity raised seven years after answer).

After considering the relevant statutory authority, the court finds that ARMC is a local governmental unit for purposes of the Act. *See also Palm Springs Medical Clinic, Inc. v. Desert Hosp.*, 628 F.Supp. 454 (C.D.Cal.1986) (hospital district is a local government under the 1984 Act and is, therefore, immune from all damage claims brought under the Sherman Act).

Ms. Sweeney has asserted antitrust damage claims against ARMC under Section One of the Sherman Act, 15 U.S.C.A. § 1. Because ARMC is a local governmental unit under the 1984 Act, it is absolutely immune from the antitrust *damage* claims asserted by Ms. Sweeney. As both parties recognize, however, the Local Government Antitrust Act applies only to damage claims and does not extend to claims for injunctive relief. *See Montauk–Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 95 (2d Cir.), *cert. denied*, 479 U.S. 872, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986); *Wicker v. Union County General Hosp.*, 673 F.Supp. 177, 186 (N.D.Miss.1987). Therefore, if a plaintiff asserts a successful claim for injunctive relief under 15 U.S.C.A. § 26, then that plaintiff also may recover the costs and attorney's fees associated with securing such relief. *Wicker*, 673 F.Supp. at 186.

Ms. Sweeney asked for injunctive relief in her original Complaint, and she has asked the court to allow her to amend her Complaint to make a specific request for injunctive relief under 15 U.S.C. § 26. Although the court has not yet ruled on Ms. Sweeney's latest motion to amend her Complaint, ARMC argues that even if a claim for injunctive relief is properly asserted, it is immune from this type of claim under the *Parker* state action exemption.

In sum, the court finds that the Local Government Antitrust Act of 1984 immunizes ARMC from any damage claims asserted by Ms. Sweeney under Section One

of the Sherman Act. The Local Government Antitrust Act, however, does not immunize ARMC from claims of injunctive relief.

**2. State Action Exemption**

■ A little over a year ago, this court set forth a thorough, and what was hoped, a well-reasoned discourse on the state action exemption doctrine. *Wall v. City of Athens*, 663 F.Supp. 747 (M.D.Ga.1987). In that opinion this court noted that in *Parker v. Brown, supra*, the Supreme Court held "that the federal antitrust laws do not prohibit a state 'as sovereign' from imposing certain anticompetitive restraints 'as an act of government.' " *Wall*, 663 F.Supp. at 751, *quoting Parker*, 317 U.S. at 352, 63 S.Ct. at 314. The opinion went on to state that in *Parker* the Supreme Court recognized that "the Sherman Act was directed against 'individual and not state action.' " *Id.* Thus, under the state action defense set forth in *Parker*, "[i]f a state 'creates the machinery' for its officers or agents to engage in activities that violate the Sherman Act, and the state 'adopts the program and enforces it,' the Sherman Act does not apply, and the challenged activity is immune from antitrust attack...." *Id.*

As noted in *Wall*, the Supreme Court has expanded the state action exemption to protect municipalities. *Id.* at 751–52, *citing City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 413, 98 S.Ct. 1123, 1137, 55 L.Ed.2d 364 (1978). A municipality's anticompetitive activities, however, are exempt from antitrust restraints only when the municipality can show that it was acting pursuant to a clearly articulated and affirmatively expressed state policy " 'to displace competition with regulation or monopoly public service.' " *Id.; see also Community Communications Co. v. City of Boulder*, 455 U.S. 40, 51–52, 102 S.Ct. 835, 840–41, 70 L.Ed.2d 810 (1982).[4]

---

4. The parties do not dispute the fact that ARMC is a municipality for purposes of the state action exemption. Indeed, the Eleventh Circuit and other courts have considered public hospital authorities to be municipalities for purposes of state action immunity. *See, e.g., Bolt*, 851 F.2d at 1284 (11th Cir.1988); *Wicker*, 673 F.Supp. at 185–86. Moreover, the parties agree that because ARMC is a municipality and not a private party, it is not subject to the "active state supervision" requirement set forth by the Supreme Court in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

In determining whether a state policy is "clearly articulated and affirmatively expressed," the court must look to the statutory scheme under which the municipality is acting. *See City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138; *see also Sproul v. City of Wooster,* 840 F.2d 1267, 1269 (6th Cir.1988); *Auton v. Dade City,* 783 F.2d 1009, 1010 (11th Cir.1986). As noted by the Supreme Court in *City of Lafayette,* the "clearly articulated" standard does not require that the municipality point to a "specific, detailed legislative authorization." *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. at 1138. Instead, the "clearly articulated" requirement is satisfied if the statutory provisions show that the state legislature contemplated that anticompetitive conduct would result from the authority granted to the municipality. *Id.; see also Auton,* 783 F.2d at 1010.

In the instant case, ARMC points to several provisions of State law which it contends satisfy the "clearly articulated" requirement. Specifically, ARMC points to certain statutes that authorize it to (1) establish rates and charges for the services and use of the facilities of the authority, O.C.G.A. § 31–7–75(10); (2) appoint officers, agents, and employees, O.C.G.A. § 31–7–75(18); (3) enter into contracts to receive services, O.C.G.A. § 31–7–75(24); (4) grant or deny, wholly or in part, staff privileges to a licensed medical practitioner, O.C.G.A. § 31–7–7(a); (5) revoke, wholly or in part, the existing staff privileges of a licensed medical practitioner, O.C.G.A. § 31–7–7(b); and (6) exercise any or all powers that a private hospital could perform in providing health care to the public, O.C.G.A. § 31–7–75(21).

After carefully reviewing these statutes and other cases interpreting the state action exemption, this court finds that the State of Georgia has established a "clearly articulated" policy which allows a public hospital to deny a licensed practitioner, such as Ms. Sweeney, access to certain patients within that hospital. The particular statue providing the basis for this policy is O.C.G.A. § 31–7–7 (1985). In that statute, the Georgia legislature gave public hospitals the absolute authority to deny staff privileges to a licensed medical practitioner applying for such privileges, as long as the denial is not based on a discriminatory motive. O.C.G.A. § 31–7–7(a). Under the statute the denial can be either complete or partial. O.C.G.A. § 31–7–7(b). But more importantly, this same statute empowers public hospitals to *revoke* the privileges of a licensed medical practitioner, either in whole or in part, for any reason. *Id.* Therefore, under this provision, a public hospital can limit the privileges of a medical practitioner who otherwise would have complete access to treat patients at the hospital. This statute clearly contemplates that a public hospital could become involved in anticompetitive conduct by denying or limiting the staff privileges of certain medical practitioners.

Ms. Sweeney is licensed by the State of Georgia as a registered nurse and is certified as a nurse-midwife by the American College of Nurse Midwives. There can be little doubt that she is a licensed medical practitioner as contemplated under O.C.G.A. § 31–7–7. The conduct Ms. Sweeney complains of, ARMC's effort to restrict her access to certain patients at the Hospital, is specifically addressed in O.C.G.A. § 31–7–7. Because ARMC was acting in accordance with this State's policy to displace competition with regulation in the area of denying or revoking hospital staff privileges, ARMC's conduct is immune from suit under the state action exemption set forth in *Parker v. Brown.*

Ms. Sweeney, however, cites several cases in support of her position that the state action exemption should not apply in this case. First, she argues that the conduct being attacked in the instant suit is akin to the purely private, anticompetitive conduct found to be unlawful in *Wall v. City of Athens, supra.* In *Wall* this court found that while the State of Georgia had established a policy to displace competition with regulation in the area of water services, the City of Athens was engaged in certain anticompetitive activities that overstepped the boundaries of the State's policy. *Wall,* 663 F.Supp. at 760. Specifically, the court found that the wilful maintenance

of a monopoly over the water services in Clarke County was protected under the state action immunity defense, whereas charging a private party an artificially low rate for water in exchange for that party's agreement not to engage in direct competition with the City was not protected. *Id.* at 759. The court also found that charging out-of-city residents a higher rate for water, without cost justification, was not protected. *Id.* The basis for the court's ruling was that in regard to those activities that were found to fall outside of the state action immunity, the City of Athens was "furthering purely parochial interests." *Id.* at 760.

In the instant suit, however, ARMC was *not* furthering purely parochial interests in denying Ms. Sweeney access to certain patients at the Hospital. ARMC is not in direct competition with Ms. Sweeney or her "Family Birth" business. Although ARMC has its own midwifery clinic, by law it cannot use this clinic to make a profit for the Hospital. *See* O.C.G.A. § 31–7–77 (1985). Consequently, ARMC's decision to grant the request of the AWC doctors was not based on the idea that it would be in a better position to compete with Ms. Sweeney if it kept her away from potential clients. ARMC was not furthering its own business interests by granting the doctors' request. Instead, ARMC was acting in response to its interests of providing safe medical care for its patients and insuring a calm working relationship between the AWC doctors and the other medical staff at the Hospital, including Ms. Sweeney. For these reasons, the court finds that the conduct Ms. Sweeney is complaining of is very different from the purely parochial conduct found to be unprotected in *Wall.*

In addition to the *Wall* decision, Ms. Sweeney cites *Bolt v. Halifax Hospital Medical Center, supra,* in support of her position that state action immunity should not apply in this case. The *Bolt* case was brought by a physician who applied for staff privileges at three hospitals in the Daytona Beach, Florida area. Initially, all three hospitals granted Dr. Bolt a probationary "appointment" which, under the by-laws of each hospital, lasted for a one-year period. At the end of the one-year period, the executive committees at all three hospitals voted to deny reappointment.

Dr. Bolt brought his claim under section One of the Sherman Act alleging that the defendants had conspired to keep him from practicing medicine in the Daytona Beach area. In his complaint, Dr. Bolt alleged the existence of three separate conspiracies: one involving the privately-owned hospital and the members of its medical staff who took part in the decision to revoke his privileges; one involving the public hospital and the members of its medical staff involved in the decision to revoke his staff privileges there; and one involving all three hospitals and the members of their staffs who had a part in the decisions to deny reappointment.

In *Bolt* the Eleventh Circuit held that a hospital and the members of its medical staff are capable of conspiring with one another. *Bolt,* 851 F.2d at 1280. The court also held, however, that state action immunity applied to the alleged conspiracies between the individual hospitals and their medical staffs. *Id.* at 1284. The court based this holding on the fact that the defendants allegedly involved in the conspiracies at the individual hospitals had satisfied both prongs of the state action test as it applies to private individuals: first, that they had acted in accordance with a clearly articulated state policy sanctioning the type of peer review used in reaching the decisions to deny reappointment; and second, that judicial review of the staff privilege decisions constituted active state supervision as required under *Midcal. Id.* at 1281, 1284.

Although the *Bolt* court held that state action immunity applied to the individual conspiracies, it reached a different conclusion as to the alleged community-wide conspiracy existing among all three hospitals. As to the community-wide conspiracy, the Eleventh Circuit stated that the defendants had failed to establish the first prong of the state action exemption test, *i.e.,* that they had acted in accordance with a clearly articulated state policy to displace competition with regulation. *Id.* at 1284. Specifi-

cally, the court noted that "Florida has articulated no policy favoring participation by any of the [private hospital] or [public hospital] defendants in a multi-hospital scheme to rid a medical community of a particular physician." *Id.*

This court finds that the *Bolt* decision is unavailing to Ms. Sweeney under the circumstances of the present case. First, Ms. Sweeney simply has produced no evidence of a conspiracy between ARMC and the AWC doctors to eliminate her "Family Birth" practice. The undisputed evidence is that ARMC was presented with a demand from the doctors which it thought prudent to grant. ARMC did not bar Ms. Sweeney from the Hospital, nor did it prohibit her from seeing patients other than those of the AWC doctors. In addition, ARMC did not revoke Ms. Sweeney's teaching privileges at the Hospital. As noted in *Bolt*, "the mere opportunity to conspire among antitrust defendants is insufficient to permit the inference of conspiracy." *Id.* at 1286. Moreover, the fact that the directors of ARMC and the doctors may have discussed Ms. Sweeney's natural birth philosophy would also be insufficient to permit an inference of conspiracy. *Id.* Simply stated, the evidence in the record does not support Ms. Sweeney's claim of an alleged conspiracy between ARMC and any members of its medical staff.[5]

Even if Ms. Sweeney has properly alleged a conspiracy between ARMC and some of the members of its medical staff,

this court is of the opinion that ARMC would still be entitled to state action immunity for its decision to deny Ms. Sweeney access to certain patients at the Hospital. In *Bolt* the Eleventh Circuit indicated that even in an alleged conspiracy between a *public* hospital and its medical staff, the hospital need only show that it was acting pursuant to a clearly articulated state policy in order to avail itself of the state action exemption. *Id.* at 1284 n. 19. In holding that the public hospital was entitled to state action immunity for the alleged conspiracy between it and its medical staff, the *Bolt* court expressed reservation as to whether the "active state supervision" requirement of *Midcal* should be applied to public hospitals. *Id.* The court recognized that the public hospital, which was a "special district" created by the Florida legislature, "may be more akin to a municipality than a private person for purposes of state action exemption analysis." *Id.* The court went on to state that to be entitled to state action immunity, a municipality need only show that it acted pursuant to a clearly articulated state policy. *Id.* As the court noted, "unlike a private person, a municipality need not also establish active state supervision." *Id.*

In the case before this court, ARMC is clearly a municipality for purposes of state action exemption. Therefore, according to footnote 19 of the *Bolt* decision, even if a conspiracy could be shown between ARMC and its medical staff, it is unlikely that

5. Ms. Sweeney testified that after Dr. Rohrer moved from the Athens area, another physician, Dr. Thomas Goggin, came to replace Dr. Rohrer at the Northeast Georgia Family Medical Center. Sweeney Dep. pp. 499, 565. According to Ms. Sweeney, Dr. Goggin had agreed to provide back-up for Ms. Sweeney's clients until December of 1987. *Id.* Shortly after promising to provide back-up, however, Dr. Goggin reversed his earlier decision and decided not to act as the back-up physician for Ms. Sweeney's clients. *Id.* at p. 566, 570–71. Ms. Sweeney testified that Dr. Goggin changed his mind about providing back-up after Denise Sims, a medical secretary at ARMC, informed him that he was running the risk of losing his privileges if he provided back-up for Ms. Sweeney.

Ms. Sweeney contends that the situation involving Ms. Sims and Dr. Goggin shows that a conspiracy existed between ARMC and some of

the members of its medical staff. The court finds this contention unpersuasive. Ms. Sims has no authority to speak or act on behalf of ARMC in the area of granting or denying staff privileges. Affidavit of John Drew, ¶ 7. Moreover, there is no evidence in the record that anyone authorized Ms. Sims to make this statement, and it appears from the record that she acted on her own in making the statement. *Id.* More importantly, however, is the fact that Dr. Goggin holds staff privileges at ARMC, and officials from ARMC have testified that ARMC has not and will not take any action against Dr. Goggin based on whether he is providing back-up for Ms. Sweeney. *Id.* Indeed, Ms. Sweeney has produced no evidence showing that ARMC has ever revoked the privileges of a member of its medical staff because that member was performing back-up for Ms. Sweeney or any other midwife.

ARMC would have to show "active state supervision" to be entitled to a state action immunity defense. As noted previously in this Order, ARMC has shown that it was acting in accordance with a clearly articulated state policy sanctioning its decision to limit Ms. Sweeney's access to patients. Under *Bolt*, it appears that such a showing would be sufficient to allow ARMC to successfully claim that it was immune from any antitrust attack stemming from an alleged conspiracy between it and its medical staff.

Finally, unlike the circumstances in *Bolt*, there is no allegation in this case of a community-wide conspiracy to eliminate Ms. Sweeney from her "Family Birth" business. In *Bolt* the Eleventh Circuit was concerned that at least three hospitals in the Daytona Beach area were involved in a wide-spread scheme to rid the medical community of a particular physician. In the instant case, however, the uncontroverted evidence shows that ARMC did not ban Ms. Sweeney from the Hospital, but only limited her access to patients. But more importantly, the evidence also shows that Ms. Sweeney has been given full privileges at St. Mary's Hospital, another hospital in the Athens area, and is actively pursuing her responsibilities at St. Mary's. Clearly, there is no basis for a claim of a community-wide conspiracy to drive Ms. Sweeney out of the Athens medical community.

One other case Ms. Sweeney cites in support of her position that ARMC is not entitled to state action immunity is *Wicker v. Union County General Hospital, supra.* The *Wicker* case was brought by a certified registered nurse anesthetist (CRNA) who alleged, among other things, that a public hospital was attempting to monopolize the market for anesthesia services in violation of section Two of the Sherman Act. Ms. Sweeney relies on that portion of the *Wicker* decision which found that the relevant statutory provisions of the State

of Mississippi did not authorize the termination of privileges of non-physician staff members. *Wicker,* 673 F.Supp. at 185.

The *Wicker* decision, however, offers no support for Ms. Sweeney's position. The plaintiff in *Wicker* was a non-physician staff member. Mississippi legislation simply did not address the termination of staff privileges for this class of employee. Moreover, the statute relating to physician medical staff members authorized termination of staff privileges only for stringent disciplinary reasons. Unlike the Mississippi statute at issue in *Wicker*, O.C.G.A. § 31-7-7 applies to licensed medical practitioners such as Ms. Sweeney. Moreover, the Georgia statute does not require a public hospital to have a statutory reason for revoking certain privileges of a licensed medical practitioner. Under the Georgia scheme, a public hospital can revoke privileges, in whole or in part, for any reason that is not otherwise in violation of state or federal law. Simply stated, Mississippi had no statute that authorized the defendants' conduct toward Ms. Wicker, whereas O.C.G.A. § 31-7-7 applies to Ms. Sweeney and authorized ARMC's conduct in limiting Ms. Sweeney's access to patients at the Hospital.[6]

To summarize, this court finds that the Local Government Antitrust Act of 1984 immunizes ARMC from damages, attorney's fees, and costs with regard to Ms. Sweeney's damage claims under section One of the Sherman Act. The court also finds that ARMC acted pursuant to a clearly articulated state policy which authorized its decision to limit Ms. Sweeney's access to certain patients at the Hospital. Accordingly, ARMC is entitled to the state action exemption set forth in *Parker v. Brown* in connection with all antitrust claims asserted by Ms. Sweeney against the Hospital. For these reasons, summary judgment is hereby GRANTED in favor of ARMC on Count II of Ms. Sweeney's Complaint.

---

**6.** Other cases cited by Ms. Sweeney in support of her position that state action immunity should not be granted to the conduct of ARMC either do not address the state action immunity defense or deal solely with private hospitals. *Medic Air Corp. v. Air Ambulance Auth.,* 843 F.2d 1187 (9th Cir.1988); *Miller v. Indiana Hosp.,* 843 F.2d 139 (3rd Cir.1988); and *Tambone v. Memorial Hosp.,* 825 F.2d 1132 (7th Cir.1987). Consequently, these cases are of little avail to Ms. Sweeney's position.

## B. *The Section 1983 Claim*

Ms. Sweeney's section 1983 claim is premised upon an alleged violation of her first amendment right to free speech. Specifically, Ms. Sweeney contends that ARMC refused to allow her and her students to work with the patients of the AWC doctors because she had advocated natural birth processes in both private and public forums. Ms. Sweeney's first amendment claim is unlike many first amendment claims in which a particular remark or memorandum can be pointed to as forming the basis of the complaint. Instead, the premise of Ms. Sweeney's section 1983 claim is that the conduct of ARMC, *i.e.*, denying her access to certain patients at the Hospital, violated her right to hold a particular philosophy regarding birth practices and to express this philosophy through public expression, through her business, and through advertising.

The parties do not dispute the fact that for purposes of Ms. Sweeney's section 1983 claim, ARMC was acting under color of state law at the time it prohibited her from seeing any patients of the AWC doctors. ARMC contends, however, that Ms. Sweeney has failed to show that at the time it denied her access to these patients, ARMC was acting pursuant to an official policy or practice under which employees or others were disciplined for espousing medical philosophies that differed from those accepted by the medical staff of the Hospital. ARMC argues that since no such policy or practice has been shown, it, as a municipality, cannot be held liable under section 1983.

ARMC's "policy or practice" defense raises an interesting question concerning whether Mr. Drew, who, as President of ARMC made the decision regarding Ms. Sweeney's access to patients, can be considered an official decision-maker for the Hospital as that term has been construed in *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and its progeny. ARMC's defense also raises the question of whether the single act of Mr. Drew is enough to trigger municipal liability un-

der *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) and its progeny. The court, however, finds it unnecessary to resolve the questions raised by ARMC's "policy or practice" defense. Even assuming that ARMC was acting pursuant to a clearly established policy or custom that had been adopted and promulgated by a final decision-maker at the time it denied Ms. Sweeney access to certain patients at the Hospital, the court finds ARMC's conduct did not violate Ms. Sweeney's first amendment right to free speech.

To establish that a public employer has violated a plaintiff's first amendment right to free speech, the plaintiff must first show that the speech touches upon a matter of public concern, and that it was a substantial motivating factor in the employment decision. *Eiland v. City of Montgomery*, 797 F.2d 953, 955 (11th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987), *citing Connick v. Myers*, 461 U.S. 138, 146–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). If the court determines that the plaintiff's speech does touch upon a matter of public concern under the test set forth in *Connick*, and that it was a motivating factor in the employment decision, then the court must "weigh the employer's interest in the efficient operation of the public office against the employee's interest in the constitutionally protected speech." *Id.* at 955–56. This balancing approach was first set forth by the Supreme Court in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed. 2d 811 (1968). Simply stated, the first task for the court in a free speech case is to follow *Connick* in deciding whether the speech touches upon a matter of public concern. If the speech does touch on a matter of public concern, then the court must use the *Pickering* balancing test to determine whether the restriction imposed on the speech was justified. The determination of whether particular speech is constitutionally protected under *Connick*, and the balancing of interests under *Pickering*, are both questions of law for the court.

*Eiland,* 797 F.2d at 957 n. 4 and n. 5.[7]

■ The threshold inquiry for this court is to determine whether Ms. Sweeney's philosophy, statements, and advertisements concerning natural birth can be fairly characterized as touching upon matters of public concern. Under *Connick, supra,* "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement." *Connick,* 461 U.S. at 148–49, 103 S.Ct. at 1690. If the speech cannot be characterized as touching upon a matter of public concern, then the first amendment inquiry is at an end. *Id.* at 955. If, however, the speech addresses a matter of public concern, then it is constitutionally protected. *Id.* at 957 n. 4.

Ms. Sweeney's speech centered around her philosophy that natural birth is a legitimate alternative for many low-risk patients. Indeed, in Ms. Sweeney's view, it is the preferred method of childbirth. As to the form of her speech, the record indicates that Ms. Sweeney advertised her "Family Birth" business in a local newspaper and made statements in support of the natural birth process in other private and public settings. The Defendants in this action contend that Ms. Sweeney also made statements concerning natural birth in the Hospital, although Ms. Sweeney admits to speaking to only one patient about this matter. As to the context of the speech, it appears from the record that the statements concerning natural birth were made not only in connection with Ms. Sweeney's philosophy regarding birth practices, but also in connection with promoting her "Family Birth" business. Certainly there can be no dispute that the newspaper advertisement was purchased for the purpose of promoting her business in the marketplace and not for the purpose of espousing her philosophical beliefs on the benefits of natural birth.

When the court considers the types of speech that have been held to touch on matters of public concern in other cases, it is left with the impression that, viewed in a light most favorable to Ms. Sweeney, her speech comes only within the outermost fringes of that type of speech protected by the first amendment. For example, in *Connick* the Supreme Court noted that a former assistant district attorney's statements concerning confidence in supervisors, the level of office moral, and the need for a grievance committee did *not* touch on matters of public concern, but only on the attorney's individual complaint concerning a transfer. *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690–91. The statement that did touch on a matter of public concern in *Connick* involved an allegation that district attorneys were being pressured to work in political campaigns on behalf of office-supported candidates. As noted by the Court, "official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights." *Id.* at 149, 103 S.Ct. at 1691.

In *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Court held that a statement concerning an attempt on President Reagan's life, made in the course of a conversation addressing the policies of the President's administration, addressed a matter of public concern. In *Eiland* the Eleventh Circuit held that the appellant's criticism of the mayor in the heat of a political campaign also touched on a matter of public concern. *Eiland,* 797 F.2d at 958. Additionally, in *Kurtz,* although the Eleventh Circuit held that many comments of a professor concerning internal management of a university did not address matters of public concern, the court held that the professor's statements

---

7. The Eleventh Circuit has twice noted that courts have experienced some confusion in applying the *Connick* and *Pickering* tests. *Kurtz v. Vickrey,* 855 F.2d 723, 730–31 n. 5 (11th Cir. 1988); *Hatcher v. Bd. of Public Educ. and Orphanage,* 809 F.2d 1546, 1556–57 n. 19 (11th Cir.1987). In both *Kurtz* and *Hatcher,* however, the Eleventh Circuit expressly followed the interpretation of the *Connick* and *Pickering* tests that it had earlier set forth in *Ferrara v. Mills,* 781 F.2d 1508 (11th Cir.1986). In *Eiland* the Eleventh Circuit adopted the test used in *Ferrara* and elaborated on its proper application. Accordingly, this court has chosen to follow the interpretation of the *Connick* and *Pickering* tests as set forth in *Eiland.*

concerning the university's mismanagement of funds, which contributed to the financial straits of the university, did touch on a matter of public concern. *Kurtz*, 855 F.2d at 729–30.

Ms. Sweeney's speech does not relate to the type of public issues that were found to address matters of public concern in the cases cited above. Ms. Sweeney is not accusing ARMC of mismanaging public funds, of violating the health laws of the State, or of discriminating among patients or employees of the Hospital. Certainly, these types of issues could be fairly characterized as touching on matters of public concern. Instead, Ms. Sweeney's speech simply relates to one method that can be used in birthing children.

■ Ms. Sweeney argues, however, that the general public and the medical community are concerned about childbirth. Assuming that this concern in the community raises Ms. Sweeney's speech to a level of constitutional protection, the court finds that ARMC's interest in the "effective and efficient fulfillment of its responsibilities to the public" outweighs Ms. Sweeney's interests in exercising her right to freely speak out on matters of natural childbirth.[8]

When the *Connick* Court applied the *Pickering* balancing test, it held that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151, 103 S.Ct. at 1692. The *Connick* Court went on to note that it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Id.* More recently, the Court has again noted that the *Pickering* balancing test "focuses on the effective functioning of the public employer's enterprise." *Rankin*, 483 U.S. at ——, 107 S.Ct. at 2899. The *Rankin* Court held that "[i]nterference

with work, personnel relationships, or the speaker's job performance can detract from the public employer's function; avoiding such interference can be a strong state interest." *Id.*

In using the *Pickering* test to balance the interests of ARMC against those of Ms. Sweeney, this court must consider the unique work setting in which Ms. Sweeney and the Defendant doctors find themselves. This court can imagine few other settings in which a close working relationship among those performing a job would be more important. In a hospital, and especially in a delivery room where *two* lives are under the care of the medical personnel, it is absolutely crucial that the staff have a harmonious and cooperative working relationship. Any rift among the staff in a delivery room would be likely to bring an unnecessary and unwanted degree of tension to those who already are feeling a certain degree of anxiety over the birth of their child. Under the worst circumstances, such a rift could conceivably result in the accidental death or injury of a mother or child.

ARMC is a not-for-profit public hospital, and its primary function is to provide adequate, safe medical care to the residents of several northeast Georgia counties. The first obligation of the Hospital is to insure the safety of its patients. When faced with the demands of the AWC doctors, ARMC exercised its judgment to enforce those demands, and thereby avoid any potential conflict between Ms. Sweeney and the AWC doctors within the confines of the Hospital. It is not unlikely that the officials at ARMC imagined a situation where an expectant mother, who had come to the Hospital shortly before the time to give birth, would find herself in the middle of a discussion concerning the preferred method of childbirth. Attempting to avoid this situation, or any other similar situation, ARMC made its decision. In this court's

---

**8.** The parties hotly contest the question of whether Ms. Sweeney's speech was also "a substantial, motivating factor" in ARMC's decision to prohibit Ms. Sweeney from working with patients of the AWC doctors. The court finds it unnecessary, however, to address this question at length. Even if the court found that the speech was a substantial, motivating factor in ARMC's decision, the interests of ARMC in maintaining a safe and secure Hospital for all of its delivery patients outweighs Ms. Sweeney's interests in advocating natural birth.

view, ARMC was primarily concerned with the safety and health of its patients. Under these circumstances, the court finds that this type of interest outweighs Ms. Sweeney's right to speak freely on the issue of natural birth.

Accordingly, the court finds that ARMC's interest in promoting and maintaining the efficiency of its public service outweighs Ms. Sweeney's interest in expressing her views on a matter that is of only limited public concern. ARMC's action, therefore, did not offend the first amendment, and summary judgment is hereby GRANTED in favor of ARMC on Count III of Ms. Sweeney's Complaint.[9]

### C. The Intentional Infliction of Emotional Distress Claim

■ In Count VII of her Complaint, Ms. Sweeney alleges that the conduct of the Defendants, including ARMC, in preventing her or her students from caring for certain patients at the Hospital, constituted intentional infliction of emotional distress in violation of Georgia law.

As noted in several cases that have been cited to the court, Georgia recognizes the tort of emotional distress in situations where the defendant's conduct has been "of an outrageous or egregious nature or so terrifying or insulting as to humiliate, embarrass, or frighten the plaintiff." *Greer v. Medders*, 176 Ga.App. 408, 409, 336 S.E.2d 328, 329 (1985); *see e.g., Stamps v. Ford Motor Co.*, 650 F.Supp. 390, 401 (N.D.Ga.1986), *quoting Georgia Power Co. v. Johnson*, 155 Ga.App. 862, 863, 274 S.E. 2d 17, 18 (1980); *Young v. Colonial Oil*

*Co.*, 451 F.Supp. 360, 361 (M.D.Ga.1978). In *Stamps*, Judge Shoob found that to satisfy this standard, the plaintiff must show that the defendant's conduct "involve[d] physically intimidating conduct that shocks the conscience." *Stamps*, 650 F.Supp. at 401. Put another way, "the acts of the defendant must be particularly outrageous so that the defendant's misdeed approaches ordinary assault." *Young*, 451 F.Supp. at 361. As noted by Judge Shoob, "[w]hen the conduct alleged falls short of the applicable standard, judgment may be entered as a matter of law." *Stamps*, 650 F.Supp. at 401.

The conduct alleged to have caused Ms. Sweeney's emotional distress involves ARMC's decision to limit her access to certain patients at the Hospital. Complaint, ¶ 53. Although the Complaint also alleges that the Defendants intentionally prevented Ms. Sweeney from teaching obstetric nursing at ARMC and at St. Mary's, the evidence shows that Ms. Sweeney was allowed to teach at ARMC even after her access to certain patients was limited, and that she has, in fact, been allowed to teach at St. Mary's. In connection with ARMC's conduct, Ms. Sweeney does not contend that insulting language was used when she was told of its decision, nor has she alleged that she was in any other way harassed by the officials of ARMC.[10]

After considering the allegations in connection with ARMC's decision to limit Ms. Sweeney's access to certain patients at the Hospital, the court finds that ARMC's conduct "falls short of the applicable stan-

---

**9.** In *Connick* the Supreme Court noted that under the *Pickering* test, the employer's burden in justifying a particular action varies depending on the nature of the employee's expression. Where, as here, the plaintiff's speech is a matter of public concern in only a limited sense, the employer's burden of justification is made lighter. As noted in the text of this Order, however, ARMC's interest in fulfilling its responsibility as a reliable Hospital would have outweighed Ms. Sweeney's right to free speech even if her speech could be characterized as fully addressing a matter of public concern.

**10.** Ms. Sweeney's attempt to hold ARMC responsible for the verbal attack of Dr. Mercer is without merit. First, Count VII makes no refer-

ence to Dr. Mercer's statements. The sole conduct that Ms. Sweeney alleged to have caused her emotional harm involved the denial of access to patients and the alleged attempt to prevent her from teaching at ARMC or St. Mary's. Second, the court noted in a previous section of this Order that Ms. Sweeney has failed to produce evidence showing that a conspiracy existed between ARMC and any member of its medical staff. Because no conspiracy existed, the acts of Dr. Mercer, an independent contractor, cannot be attributed to ARMC. Moreover, ARMC has produced competent evidence to show that it in no way condoned Dr. Mercer's verbal attack. Affidavit of John Drew, ¶ 6.

dard" used in establishing an actionable claim for intentional infliction of emotional distress. ARMC's conduct certainly does not "shock the conscience," *Stamps,* 650 F.Supp. at 401, nor is it so outrageous that it "approaches ordinary assault." *Young,* 451 F.Supp. at 361. Moreover, those cases cited by Ms. Sweeney in support of her position that she has stated a valid claim of intentional infliction of emotional distress against ARMC all involve conduct far more egregious than the acts of ARMC in the instant case. *See Cummings v. Walsh Constr. Co.,* 561 F.Supp. 872 (S.D.Ga.1983) ("repeated solicitations for sex along with threats of discharge" occurring over a long period of time, both on and off the job site, sufficient to state an actionable claim for intentional infliction of emotional distress); *Carrigan v. Cent. Adjustment Bureau, Inc.,* 502 F.Supp 468 (N.D.Ga.1980) (plaintiff stated claim for emotional distress by showing that he received several harassing phone calls from the defendant even after he had denied the debt and had instructed the defendant not to call him again); *Greer* 176 Ga.App. at 409, 336 S.E.2d at 329 (patient stated claim for emotional distress by showing that his physician repeatedly swore at him and his wife while he was in a hospital bed, and following the statements his wife began to cry, and he "experienced episodes of uncontrollable shaking, for which he required psychiatric treatment"); *Yalanzon v. Citibank (South Dakota) N.A.,* 169 Ga.App. 961, 315 S.E.2d 677 (1984) (plaintiff "could *conceivably* recover for the tort of intentional infliction of emotional distress" if he could show defendant made several harassing phone calls with the intention of causing emotional distress); *Dunn v. W. Union Tel. Co.,* 2 Ga.App. 845, 59 S.E. 189 (1907) (actionable claim for emotional distress stated where agent of defendant used strong and abusive language in unlawfully evicting plaintiff from the premises).

Ms. Sweeney made no allegations that the officials at ARMC used abusive language when informing her of their decision, nor has she alleged that she was otherwise harassed by these officials. The cases just noted do not support her claim of intentional infliction of emotional distress against Defendant ARMC. For these reasons, summary judgment is hereby GRANTED in favor of ARMC on Count VII of Ms. Sweeney's Complaint.

## IV. CONCLUSION

After considering the pleadings and evidence in the record, it has become clear to this court that the real dispute here is between Ms. Sweeney and the doctors. ARMC is not in the hospital business to make huge profits, and it has absolutely no interest in seeing Ms. Sweeney's "Family Birth" business squeezed out of the marketplace. It does, however, have a fundamental interest in insuring the safest possible treatment for its patients, and in providing a harmonious atmosphere for all who walk or are carried through its doors. In the unfortunate situation that has arisen here, ARMC found itself unavoidably involved in a dispute between those holding different philosophical beliefs on the subject of childbirth. When faced with a difficult decision it was forced to make because of no fault of its own, ARMC responded in a way that it felt would best serve its primary concern, the safety and care of its patients. This court has found no basis in the law for requiring the Hospital to go to trial to defend that decision.

For the reasons stated above, summary judgment is hereby GRANTED in favor of ARMC on Counts II, III, and VII of Ms. Sweeney's Complaint.

SO ORDERED.